Ethel BROWN and Harry Brown, Plaintiffs,

v.

Hugh BULLOCK, Arthur F. Burns, Robert E. Clark, Nathaniel P. Hill, John M. Hincks, Grayson Kirk, Harris J. Nelson, Frank Pace, Jr., Maxwell D. Taylor, Calvin Bullock, Ltd., and Dividend Shares, Inc., Defendants.

United States District Court
S. D. New York.
March 9, 1961.
Supplemental Memorandum-Decision
March 31, 1961.

**210**

Rosenthal & Gurkin, New York City, for plaintiffs; Pomerantz Levy & Haudek, Rosenfeld & Silverman, Abraham L. Pomerantz, William E. Haudek, New York City, of counsel.

Hughes, Hubbard, Blair & Reed, New York City, for defendants Arthur F. Burns, Grayson Kirk and Frank Pace, Jr.

Cole, Grimes, Friedman & Deitz, New York City, for defendant Dividend Shares, Inc.

Sullivan & Cromwell, New York City, for defendants Calvin Bullock, Ltd., Hugh Bullock and Robert E. Clark; David W. Peck, Alfred Jaretzki, Jr., Marvin Schwartz, Richard Sexton, New York City, of counsel.

Walter P. North, Gen. Counsel, Mitchell S. Rieger, Associate Gen. Counsel, Joseph B. Levin, Asst. Gen. Counsel, Meyer Eisenberg, Atty., SEC, Washington, D. C., amicus curiae.

HERLANDS, District Judge.

Does the amended complaint against the eleven defendants state a claim upon which relief can be granted under the Investment Company Act of 1940, 15 U.S.C.A. § 80a–1 et seq.?

The question is raised by motions pursuant to F.R.Civ.P., rule 12(b) (1) and (6), 28 U.S.C.A., made by the attorneys for defendants Calvin Bullock, Ltd., Hugh Bullock and Robert E. Clark, and by the attorneys for defendants Arthur F. Burns, Grayson Kirk and Frank Pace, Jr.

The motions are opposed by the plaintiffs and, to the extent that certain questions of law are involved, by the Securities and Exchange Commission as *amicus curiae.*

Because the facts well-pleaded in the amended complaint and the inferences reasonably flowing therefrom are deemed admitted *arguendo*, the pending motions raise only issues of law. However, counsel differ radically in their formulation of those issues. It has thus become necessary to analyze the allegations of the amended complaint in detail in order to place the issues in correct and sharp focus.

The Investment Company Act of 1940 will be referred to as "the 1940 Act" or "the Act"; the Securities Act of 1933, 15 U.S.C.A. § 77a et seq., as "the 1933 Act"; the Securities Exchange Act of 1934, 15 U.S.C.A. § 78a et seq., as "the 1934 Act"; the defendant Dividend Shares, Inc., as the "Fund"; the defendant Calvin Bullock, Ltd., as the "Management Company"; the Securities and Ex-

change Commission, as the "Commission"; and the amended complaint as "the complaint."

### Allegations of the Complaint.

*Jurisdiction*

Jurisdiction rests on the Act and "on the principles of pendent jurisdiction" (par. 1). There is no allegation or claim of diversity of citizenship.

*Plaintiffs*

Plaintiffs are and have been shareholders of the Fund since October 14, 1955 and at the times of the transactions complained of [par. 2(a)].

*Capacities in Which Plaintiffs Are Suing*

The action is brought by plaintiffs "derivatively on behalf of the Fund and representatively on behalf of themselves and all other shareholders of the Fund similarly situated" [par. 2(b)].

"The Fund has about 100,000 shareholders, scattered all over the United States and foreign countries. Their identity is subject to frequent changes by reason of sales of new shares and redemptions of old ones" [par 20(d)].

"The shareholders constitute a class so numerous as to make it impracticable to bring them all before the Court. Plaintiffs will fairly insure their adequate representation" (par. 21).

*The Fund, Its Organization and Character*

The Fund, a Maryland corporation organized on July 25, 1932 with its principal office at One Wall Street, Manhattan, N. Y., was and is "registered under the Act as a diversified open-end management investment company" (pars. 3, 17). Its shares "have been and are being offered for sale and sold to the public on a continuous basis" (par. 3).

*The Nine Individual Defendants and Two Corporate Defendants*

The nine individual defendants are the directors of the Fund. They have served as such directors since prior to October 14, 1955, except that defendants Burns and Kirk became directors in 1958, and defendants Clark and Taylor in 1959.

Since prior to October 14, 1955 and to date, defendant Bullock has been the president of the Fund (par. 4).

The two corporate defendants are the Fund and the Management Company.

*Net Asset Value of the Fund*

The net asset value of the Fund was $188,548,815 on October 31, 1955 and $254,701,160 on April 30, 1960. Its high was $267,612,897 on October 31, 1959 (par. 5).

*The Management Company*

The Management Company, a corporation with its principal office at One Wall Street, Manhattan, N. Y., was and is "the investment adviser of the Fund" and "the principal underwriter and sole distributor of the shares of the Fund" (par. 6).

The Management Company was and is "the investment adviser" of two other domestic diversified open-end management investment companies known as Bullock Fund, Ltd. ("Bullock Fund") and Nation-Wide Securities Company, Inc. ("Nation-Wide") [par. 12(a)].

The operative facts of the occurrences and transactions giving rise to the plaintiffs' claim, as pleaded (cf. Schwartz v. Eaton, 2 Cir., 1959, 264 F.2d 195, 196 note 2, 197 note 3, will be spotlighted by collating related allegations of the complaint. The following recitals are quoted from the complaint or are close paraphrases.

The Complete Domination and Control of the Fund by the Defendant-Management Company and the Defendants Bullock and Clark.

### I.

The Management Company has two contracts (annually extended) with the Fund: an "underwriting" contract and an "investment advisory" contract. By the underwriting contract, the Management Company was and is the principal underwriter of the Fund and the sole distributor of the Fund's shares (par. 11). By the investment advisory contract the Management Company was and

is the investment adviser of the Fund (pars. 6, 10). The Management Company supervises the Fund's portfolio securities and pays certain of the Fund's expenses (par. 10).

Defendant Bullock is the president of both the Management Company and the Fund. He is also a director of both companies. He owns a majority of the shares of the Management Company (par. 7).

Defendant Clark, the executive vice-president of the Management Company, is a director of both companies (par. 7).

Officers or associates of the Management Company are the three vice-presidents, the secretary and the treasurer of the Fund (par. 7).

## II.

The defendants Bullock, Clark and the Management Company completely dominated and controlled the Fund, not only by virtue of their above-indicated intimate and interlocking relationship, but also by their:

A. Selecting and nominating each of the Fund's directors (par. 8). These directors receive substantial compensation as such Fund directors and also receive additional substantial compensation as directors of other investment companies, for which latter positions they were likewise selected by Bullock, Clark and the Management Company (par. 8). The Fund's directors are either affiliated with or beholden to Bullock, Clark and the Management Company (par. 8).

B. Dominating and controlling: (1) the Fund's board of directors; (2) the Fund's management; (3) the Fund's personnel; and (4) the Fund's business and affairs [par. 9(a)].

### The Wrongful Transactions Concerning the Investment Advisory Contract and Its Yearly Extensions.

#### I.

The relative positions of the defendants in such transactions were as follows: Bullock, Clark and the Management Company "caused" the transactions. The other eight defendants "participated or acquiesced in" such transactions "with knowledge or notice of their wrongful character" [par. 9(b)].

#### II.

The voting of the Investment Advisory Contract and its yearly extensions took place under the following circumstances:

A. Since prior to 1955, the Fund's board of directors has annually voted to continue the investment advisory contract with the Management Company (par. 10).

B. The adoption of that contract and its yearly extensions was the result of "the arbitrary action, collusion, gross negligence or reckless disregard of duty of the individual defendants and the Management Company" [par. 15(a)].

The individual defendant-directors of the Fund "abdicated their functions" by acts of commission and omission [par. 15(c)], in that they "made no effort to ascertain whether" some organization other than the Management Company could be secured to supply the same investment advisory services "on terms more advantageous to the Fund" and they made no effort to persuade or bargain at arm's length with the Management Company to supply such services on terms more advantageous to the Fund [par. 15(b)].

C. Since prior to 1955, false and misleading proxy statements (filed with the Commission and mailed to the Fund's shareholders) were used by the defendants to bring about the election of the defendant-directors of the Fund and to induce inaction by the Fund's stockholders with respect to their statutory right [under the Act, section 15(a) (3)] to terminate the investment advisory contract or to seek its renegotiation on terms more favorable to the Fund (par. 19).

"The proxy statements represented to the shareholders that the investment advisory arrangements between the Fund and the Management Company were 'similar to the arrangements between Calvin Bullock, Ltd. [i. e., the Manage-

ment Company] and five other companies.' The reference to 'five other companies' was intended to and did include the Bullock Fund and Nation-Wide" [par. 19(b)].

"Such representation was, to defendants' knowledge or notice, an untrue statement of a material fact and omitted to set forth facts necessary in order to prevent said representation, in the light of the circumstances under which it was made, from being materially misleading, in that the investment advisory arrangements of the Management Company with the Fund called for a substantially larger fee than the corresponding arrangements of the Management Company with the Bullock Fund and with Nation-Wide" [par. 19(c)].

### III.

The operation and character of the Investment Advisory Contract and its yearly extensions involved the following features:

A. For the five fiscal years of 1955 to 1959 and the six months ended April 30, 1960, the Management Company received from the Fund investment advisory fees totaling $4,421,435 (par. 10).

B. The investment advisory fees charged by the Management Company to the Fund were and are one-half of one percent of the first $100,000,000 net assets and one-quarter of one percent of any excess above $100,000,000 (par. 12). The Management Company did and now does act as the investment adviser of Bullock Fund, Ltd. and Nation-Wide Securities Company, Inc. The Management Company's services to the Fund have been and are "substantially the same in nature and extent" as its services to the Bullock Fund and Nation-Wide. Nevertheless, the investment advisory fees charged by the Management Company to the Bullock Fund and to Nation-Wide were and are "much smaller, proportionately and absolutely, than those charged by it to the Fund" (par. 12).

C. This method is "grossly unfair" for the stated reason that once the net assets exceed $100,000,000 the fixed percentage of one-quarter of one percent is not scaled down as the value of the net assets increases, although the services of the Management Company remain constant regardless of the net asset value of the Fund. This arrangement will become increasingly more harmful to the Fund (par. 13).

D. The amounts received by the Management Company from the Fund as investment advisory fees "were and are excessive and out of proportion to the value of the services performed, as the defendants knew or should have known" (par. 16).

E. The payments of the investment advisory fees by the Fund and their receipt by the Management Company, under the above-stated conditions and circumstances, constituted:

(1) An "unlawful and willful conversion" by the defendants of the Fund's moneys, property and assets to the use of the Management Company. This was a violation of section 37 of the Act (par. 17).

(2) "Gross abuse of trust, gross misconduct, willful misfeasance, bad faith, gross negligence or reckless disregard of official and contractual duties by the defendants" (par. 17). This was a violation of the statutory duties imposed upon the defendant-directors as directors and upon the defendant-Management Company as investment adviser. These duties were imposed by the Act, sections 1(b) (2), 10, 15, 17(h) and (i), and 36 (par. 17).

(3) A breach by the defendants of "their fiduciary duties to the Fund" to the defendants' benefit and profit and "a gift, waste and a spoliation of the assets of the Fund" to the defendants' benefit and profit. This was a "violation of New York and Maryland laws" (par. 17).

F. The following were and are the results of the defendants' use of false proxy statements referred to above:

(1) The defendant-directors were elected and they voted the yearly exten-

sions of the investment advisory contract (par. 19).

(2) "[T]he shareholders of the Fund failed to exercise their rights to terminate the investment advisory contract" under the Act, section 15(a) (3) or to seek its renegotiation on terms more favorable to the Fund [par. 19(g)].

(3) The Fund and its shareholders suffered great damage [par. 19(g)].

(4) The defendants profited [par. 19 (g)].

(5) The defendants' use of such false proxy statements was a violation of the Act, sections 20(a) and 34(b) and a violation of the Commission's Rules 270.20a–1(a) and X–14A–9 [par. 19(d)].

### IV.

By reason of the above-stated premises the investment advisory contract and its yearly extensions are "void," the invalidity appearing more particularly as follows:

A. The contract and its yearly extensions are rendered void by virtue of the Act, section 47(b) and New York and Maryland law (par. 18).

B. The above-described use of false proxy statements invalidated the elections of the defendant-directors of the Fund [par. 19(e)].

C. Inasmuch as the invalidly elected defendant-directors of the Fund lacked the power to exercise the functions of directors of the Fund, the yearly extensions of the investment advisory contract were illegal and void so far as concerns the defendants, by virtue of the Act, section 47(b) and New York and Maryland law [par. 19(f)].

The Wrongful Transactions Concerning the Underwriting Contract and Its Yearly Extensions.

### I.

The relative positions of the defendants in such transactions were as follows: Bullock, Clark and the Management Company "caused" the transactions. The other eight defendants "participated or acquiesced in" such transactions "with knowledge or notice of their wrongful character" [par. 9(b)].

### II.

The voting of the Underwriting Contract and its yearly extensions took place under the following circumstances:

A. Since prior to 1955, the Fund's board of directors has annually voted to continue the Underwriting Contract with the defendant-Management Company (par. 11).

B. The adoption of the Underwriting Contract and its yearly extensions was the result of "the arbitrary action, collusion, gross negligence or reckless disregard of duty of the individual defendants and the Management Company" [par. 15(a)].

The individual defendant-directors of the Fund "abdicated their functions" by acts of commission and omission [par. 15(c)], in that they "made no effort to ascertain whether" some organization other than the Management Company could be secured to supply the same underwriting services on terms more advantageous to the Fund and they made no effort to persuade or bargain at arm's length with the Management Company to supply such services on terms more advantageous to the Fund [par. 15(b)].

### III.

The operation and character of the Underwriting Contract and its yearly extensions involved the following features:

A. The Management Company did and does charge the following salesload for selling the Fund's shares: eight and two-thirds percent of the sales price on transactions under $10,000; seven and one-half percent on transactions involving from $10,000 to $24,999, and smaller percentages on larger transactions (par. 14).

Pursuant to the Underwriting Contract, the Management Company did and now does act as "the principal underwriter and sole distributor" of the Fund's shares. Under this contract, the Management Company "charges the pur-

rhasers of the shares" the salesload or commission above-stated (par. 11).

The Management Company was and is the principal underwriter and sole distributor of the shares of Nation-Wide Securities Company, Inc., another domestic diversified open-end management investment company. The salesload charged by the Management Company, in the case of Nation-Wide, was and is seven and one-half percent of the sales price on transactions under $25,000; and smaller percentages on larger transactions. The sale of the Fund's shares did and does require "no greater efforts or expenses than the sale of the shares of Nation-Wide" (par. 14).

B. For the five fiscal years of 1955 to 1959, the Management Company realized from the sales of the Fund's shares (and after deducting all commissions and charges paid to agents or other investment dealers) a sum totaling $2,168,966 (par. 11).

C. The amounts received by the Management Company as salesload were and are "excessive and out of proportion to the value of the services performed, as the defendants knew or should have known" (par. 16).

D. "Such excessive payments and the receipt thereof by the Management Company," under the above-stated conditions and circumstances, constituted:

(1) An "unlawful and willful conversion" by the defendants of the Fund's moneys, property and assets to the use of the Management Company. This was a violation of the Act section 37 (par. 17).

(2) "Gross abuse of trust, gross misconduct, willful misfeasance, bad faith, gross negligence or reckless disregard of official and contractual duties by the defendants." This was a violation of the statutory duties imposed upon the defendant-directors as directors and upon the defendant-Management Company (par. 17). These duties were imposed by the Act, sections 1(b) (2), 10, 15, 17 (h) and (i), and 36 (par. 17).

(3) A breach by the defendants of "their fiduciary duties to the Fund" to the defendants' benefit and profit and "a gift, waste and spoliation of the assets of the Fund" to the defendants' benefit and profit. This was a "violation of New York and Maryland laws" (par. 17).

### IV.

By reason of the premises, the Underwriting Contract and its yearly extensions are "void" by virtue of the Act, section 47(b) and New York and Maryland law (par. 18).

#### Futility of Demand on Fund's Board of Directors.

"Demand on the Board of Directors of the Fund to bring this action would be futile since all or at least a majority of the directors participated in the wrongful transactions complained of" (par. 20).

#### Futility and Lack of Necessity of Demand on Fund's Shareholders.

"Demand on the shareholders of the Fund to bring this action is unnecessary and would be futile because":

(a) The transactions are "incapable of ratification by less than the unanimous vote of all shareholders" because the transactions "were in violation of law, constituted gifts and waste of corporate assets and a fraud on the Fund" [par. 20(a)].

(b) "The shareholders cannot by resolution or otherwise require the Fund or its Board of Directors to bring an action" [par. 20(b)].

(c) "Even if the shareholders were to direct the Board of Directors to bring this action, its control would lie in the hostile hands of the directors, who could not be entrusted with its effective prosecution" [par. 20(c)].

(d) For reasons detailed, a proxy fight with the management would be prohibitively expensive, dilatory, and undesirable from the viewpoint of possible laches and time-bar [par. 20(d)].

*Impracticability of Bringing All Share-holders Before the Court*

The shareholders (about 100,000) are so numerous as to make it impracticable to bring them all before the Court (par. 21).

*Prayer for Relief*

Plaintiffs pray for judgment:

1. "Declaring the investment advisory contract and its extensions to be null and void."

2. "Declaring the underwriting contract and its extensions to be null and void."

3. Requiring the Management Company and the individual defendants "to repay the investment advisory fees to the Fund."

4. Requiring the Management Company and the individual defendants "to account to the Fund and its shareholders for profits and damages."

5. "Allowing plaintiffs the costs and expenses of this action, including reasonable counsel fees."

The Issues.

This one-count complaint, cast in terms of both a derivative and representative stockholder's action, charges violations of the following eight sections of the Act.

| 1940 Act | Title 15 U.S.C.A. | Subject | Charging Paragraphs of Complaint |
|---|---|---|---|
| § 15(a) (3) | § 80a-15(a) (3) | Stockholders' right to terminate advisory contracts | 17(b) and 19(g) |
| § 17(h) and (i) | § 80a-17(h) and (i) | Invalidity of exculpatory clauses | 17(b) |
| § 20(a) [SEC Rules under the 1940 Act, Rule 20a-1; 17 C.F.R. 270.20a-1. [SEC Rules under § 14(a) of the 1934 Act, § 78n of title 15 U.S.C.A., Rule X-14A-9, 17 C.F.R. 240.14a-9 | § 80a-20(a) | Proxy solicitation | 19(a)(b)(c)(d)(e) |
| § 34(b) | § 80(a)-33(b) | Untrue statements in any document transmitted pursuant to the Act | 19(d) |
| § 36 | § 80a-35 | Gross misconduct and gross abuse of trust | 17(b) |
| § 37 | § 80a-36 | Willful conversion | 17(a) |
| § 44 | § 80a-43 | Jurisdiction of suits at law and in equity | 1 |
| § 47(b) | § 80a-46 | Invalidity of contracts violating the Act | 18 and 19(f) |

The dispositive issues are:

I. Whether the statutory provisions upon which the plaintiffs' claim is based created any duties owing by the defendants to the Fund or to the plaintiffs.

II. Whether the defendants' acts as alleged in the complaint violated any of those duties.

III. Whether the plaintiffs can bring this action in this court to enforce the liabilities and duties created by the Act.

These issues pose a problem of statutory interpretation requiring a view in depth. It is interpretation of the various statutory provisions—not fragmented into isolated sections nor subjected to mere black-letter reasoning—as integrated parts of a remedial enactment possessing a fundamental unity of specific policy and stated objectives.

The Act regulates the entire investment company industry. Congress sought to regulate that industry as comprehensively as the banking and insurance businesses are regulated. The Act is pervasive in scope and detail. In addition, the Commission is given broad power to promulgate rules, regulations and orders.

The Act is to be sharply contrasted with the much narrower Securities Act of 1933 and the Securities and Exchange Act of 1934. The 1933 and 1934 Acts articulated only a policy of disclosure and securities registration and the regulation of certain securities practices. On the other hand, the 1940 Act placed the investment company business under close but workable regulation. One of the cogent reasons for the passage of the 1940 Act was the inadequacy of the 1933 and 1934 Acts to cope with the grave abuses and evils that had developed in some quarters of the investment company business.

Those abuses and evils documented in fastidious and convincing detail were placed before the Senate and House Committees by the special investigating staff of the Securities and Exchange Commission. The investigation lasted four years. Comprehensive hearings were held. Technical studies and survey reports, case memoranda and comparative legislative studies, subject by subject, were submitted to the Congressional committees.

The investment companies industry, through counsel and company executives, submitted their views on the record. These industry representatives worked in close cooperation with the Commission's staff. Industry recognized the abuses and evils; sought their elimination; and welcomed regulation, not only for the protection of the public and the investors, but for the good of legitimate companies.

Eventually, the representatives of industry and the Commission expressed their agreement in a written memorandum dated May 13, 1940. This embodied the framework of an acceptable statute. The product of that compromise agreement was the 1940 Act.

In terms of draftsmanship, the 1940 Act was to some extent built upon the cognate provisions of the 1933 and 1934 Acts, the Public Utility Holding Company Act of 1935, 15 U.S.C.A. § 79 et seq., the Trust Indenture Act of 1939, 15 U.S.C.A. § 77aaa et seq., and other regulatory statutes. But to a major degree, the 1940 Act was freshly designed and constructed to meet realistically the particular requirements and the special problems of the investment company business.

The foregoing barest outline is fulsomely documented in the following records of the 76th Congress, 3d Session:

Senate Report No. 1775 (Report to accompany S. 4108), June 6, 1940, Committee on Banking and Currency. [S. 4108 was a substitute for S. 3580, introduced March 14, 1940.]

Hearings before a Subcommittee of the Committee on Banking and Currency, U. S. Senate, on S. 3580, Part 1 (April 2, 3, 4, 5, 8, 9, and 10, 1940); Part 2 (April 12, 15, 16, 17, 18, 19, 22, 23, 24, 25, and 26, 1940); Part 3 (Exhibits); Part 4 (May 31 and June 4, 1940).

House of Representatives Report No. 2639 (Report to accompany H.R. 10065), June 18, 1940, Committee on Interstate and Foreign Commerce.

Hearings before a Subcommittee of the Committee on Interstate and Foreign Commerce, House of Representatives, on H.R. 10065 (June 13 and June 14, 1940).

All of the above legislative material has received the Court's close study in connection with the pending motions. Except as may otherwise be indicated, citations to and quotations from the Senate and House Hearings and Reports refer to the above-mentioned hearings and reports.

There will be occasion to consider the legislative history of particular sections in the course of this opinion. At this juncture, however, it is necessary to spotlight a preliminary but highly significant provision: Congress built into the statute a canon of construction. This is set forth in the concluding sentence of section 1, as follows:

"It is hereby declared that the policy and purposes of this title, in accordance with which the provisions of this title shall be interpreted, are to mitigate and, so far as is feasible, to eliminate the conditions enumerated in this section which adversely affect the national public interest and the interest of investors."

This is more than a mere exordium. It is a directive to the courts.

Section 1, entitled "Findings and Declaration Of Policy," finds "that the investment companies are affected with a national public interest" in the light of five enumerated factors, recited in subsection "(a)." The fifth of such factors, referring to the inadequacy of "State regulation," reads as follows (emphasis supplied):

"(5) the activities of such companies, extending over many States, their use of the instrumentalities of interstate commerce and the wide geographic distribution of their security holders, *make difficult, if*

*not impossible, effective State regulation of such companies in the interest of investors."*

Section 1 then declares "that the national public interest and the interest of investors are adversely affected" in eight generalized situations, which are recited in subsection (b). The following of such situations are pertinent to a consideration of the issues herein (emphasis supplied):

"(1) *when investors* purchase, pay for, exchange, receive dividends upon, vote, *refrain from voting,* sell, or surrender securities issued by investment companies *without adequate, accurate, and explicit information, fairly presented, concerning* the character of such securities and *the circumstances, policies,* and financial responsibility *of such companies and their management:*

"(2) *when investment companies are* organized, *operated, managed,* or their portfolio securities are selected, *in the interest of directors,* officers, *investment advisers,* depositors, *or* other affiliated persons thereof, *in the interest of underwriters,* brokers, or dealers, in the interest of special classes of their security holders, or in the interest of other investment companies or persons engaged in other lines of business, *rather than in the interest of all classes of such companies' security holders;*

"(3) *when investment companies* issue securities containing inequitable or discriminatory provisions, or *fail to protect the* preferences and *privileges of the holders of their outstanding securities;*

"(4) when the control of investment companies is unduly concentrated through pyramiding or inequitable methods of control, or is inequitably distributed, or *when investment companies are managed by irresponsible persons;*

\*    \*    \*    \*    \*    \*

"(6) when investment companies are reorganized, become inactive, or change the character of their business, or *when the control or management thereof is transferred, without the consent of their security holders;* \* \* \* "

The foregoing explicit enumeration of the conditions which adversely affect the national public interest and the interest of investors, together with the congressionally promulgated canon of construction, constitute a frame of reference for the problems of interpretation involved in this case.

The defendants do not dispute that the complaint alleges "common law charges of waste and breach of fiduciary duty" (defendants' brief, 2–3, 5). According to the defendants, "the essence" of the complaint is that "the investment advisory fees paid by" the Fund to the Management Company "are excessive and wasteful" (defendants' brief, 2). As formulated by the defendants, the issues are whether the Act regulates "the size of the investment advisory fee" or limits "the underwriting commissions"; whether federal jurisdiction can be predicated "upon alleged violations of the SEC proxy rules" asserted "in a derivative action"; and whether federal jurisdiction can be predicated upon "a representative claim" based "solely upon allegations that 'excessive' underwriting commissions were paid by a purchaser of securities" (defendants' brief, 5).

The defendants' formulation oversimplifies and incorrectly frames the issues.

The defendants ignore the following additional allegations and the permissible inferences therefrom on these motions: that the defendants knew the compensation to be excessive; that the so-called independent directors were beholden to Bullock and Clark for lucrative positions; that they were dominated and controlled by Bullock and Clark; that the Fund's personnel, business, affairs, management and operations were completely dominated and controlled by Bullock, Clark and the Management Company; that the board of directors of the Fund had abdicated their functions in favor of Bullock, Clark and the Management Company; that the Fund's contracts with the Management Company were the result of collusion between the Fund's directors and the Management Company and designed for the benefit of the fiduciary (the Management Company) to the detriment of the Fund; that the Fund's directors abdicated their statutory duty to use their judgment in approving the annual extensions of the investment advisory and underwriting contracts; that false and misleading proxy statements transmitted by the defendants were used to induce the Fund's stockholders to forego the exercise of their statutory, absolute privilege to terminate the investment advisory contract at any time; in brief, that the Fund became a mere adjunct of the Management Company through the defendants' gross misconduct and gross abuse of trust.

As pleaded, the excessive fees or commissions and breaches of fiduciary duties were only some of the elements in a complete emasculation of the Fund by the Management Company and the defendants for their own benefit in violation of specific provisions of the Act.

The court is now dealing with matters of pleading and not of proof. This aspect of the case must be emphasized in fairness to both the plaintiffs and the defendants.

Plaintiffs invoke federal jurisdiction not only under the "federal question" statute (28 U.S.C. § 1331) but principally under section 44 of the 1940 Act and the doctrine of pendent jurisdiction.

Section 44 provides, in relevant part:

"The district courts of the United States and the United States courts of any Territory or other place subject to the jurisdiction of the United States shall have jurisdiction of violations of this title or the rules, regulations, or orders thereunder, and, *concurrently with State* and Terri-

torial *courts, of all suits in equity and actions at law brought to enforce any liability or duty created by, or to enjoin any violation of, this title or the rules, regulations, or orders thereunder.* \* \* \* *Any suit or action to enforce any liability or duty created by, or to enjoin any violation of, this title or rules, regulations, or orders thereunder,* may be brought in any such district or in the district wherein the defendant is an inhabitant or transacts business, and process in such cases may be served in any district of which the defendant is an inhabitant or transacts business or wherever the defendant may be found. Judgments and decrees so rendered shall be subject to review as provided in sections 128 and 240 of the Judicial Code, as amended, and section 7, as amended, of the Act entitled 'An Act to establish a court of appeals for the District of Columbia', approved February 9, 1893. \* \* \* " (Emphasis supplied.)

■ The only issue is whether the complaint alleges claims arising under the 1940 Act, of which this court has jurisdiction under section 44. Once jurisdiction under section 44 is established, this court has the power also to adjudicate any common law claims involved in the action, if the proof to sustain the federal and non-federal claims is the same. Schwartz v. Eaton, 2 Cir., 1959, 264 F.2d 195; Hurn v. Oursler, 1933, 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148; Zalkind v. Scheinman, 2 Cir., 1943, 139 F.2d 895, 902.

The plaintiffs do not contend that, where there are grounds for a derivative stockholder's action, the case involves a "federal question" simply because the corporation is a registered investment company. The plaintiffs recognize that a stockholder's derivative action, even though otherwise well founded, cannot be brought in the federal court merely because the corporation is a registered investment company. Such a company may

have a non-federal claim, e. g., for breach of contract, mismanagement or simple negligence. It is undisputed that, under such circumstances, neither the company itself nor a stockholder on its behalf can take that claim into the federal forum.

Plaintiffs' position is that specific sections of the Act impose specific duties upon the directors, investment advisers and principal underwriters of registered companies; and that section 44 grants federal jurisdiction if violations of these specific statutory duties are alleged.

In the final analysis, therefore, the determinative question is whether, on the facts pleaded, the defendants were under a "liability or duty created by" the Act, within the purview of section 44. If so, this court has jurisdiction because the liabilities sought to be enforced are created by the Act. The interrelated question is whether section 44 grants this court jurisdiction of this private action brought to enforce liabilities under the Act.

■ That federal jurisdiction under section 44 includes jurisdiction of actions brought by private parties, including stockholders' suits, to enforce any liability or duty created by the Act has been held in such cases as Cogan v. Johnston, D.C.S.D.N.Y.1958, 162 F.Supp. 907 and Schwartz v. Bowman, D.C.S.D.N.Y.1957, 156 F.Supp. 361, appeal dismissed Schwartz v. Eaton, 2 Cir., 1959, 264 F.2d 195.

In Cogan, supra, the action was both derivative and representative. It was brought against the corporation and four directors and officers. The action was based upon section 7 of the 1940 Act and sought an injunction and the appointment of a receiver. The court denied defendants' motion under F.R.Civ.P. rule 12(b), that was grounded on lack of jurisdiction and on exclusive primary jurisdiction in the SEC.

There were two causes of action. Both sought an injunction against the continuing violations of the Act, against the individual defendants preventing them from continuing as officers and directors

of the company, and the appointment of a receiver to enable the company to comply with the Act. Jurisdiction for both causes was predicated on section 44 of the Act. Jurisdiction for the second cause was also predicated on section 36 of the Act. The first claim charged that the defendants, "in pursuance of a conspiracy to circumvent the Act" (162 F.Supp. at page 908) applied for and obtained an order of "deregistration" from the SEC as a result of which the company (an investment company) became an unregistered investment company and "in numerous ways" was violating the Act; and that the indvidual defendants were conspiring "to freeze out the public stockholders" of the company "by transactions in violation of the Act" (at page 908).

The second claim alleged that the individual defendants caused the company "to violate the Act for their own interests" exclusively and that they have been guilty of "gross abuse of trust as corporate officers and directors" (at page 908).

The court (Judge Edelstein) made the following points:

1. That, in a proper case, an individual may bring an action in the District Court to enforce liabilities or to enjoin violations under the Act (at page 909).

2. The first claim was, therefore, properly in the District Court because it is based on "violations by an unregistered investment company under section 7 [of the Act] 15 U.S. § 80a–7, 15 U.S.C.A. § 80a–7" (at page 909). Section 7 specifically makes it unlawful for an unregistered investment company to sell, etc. stocks.

3. The second claim, so far as it was based on section 36, could not be sustained because section 36 authorizes the Commission to bring an action in respect of a registered investment company, whereas here the company was not registered (at page 909).

4. However, even the second claim alleged conduct by the individual defendants "in violation of the Investment Company Act." Since it "does not appear to

a certainty that the plaintiff is entitled to no relief under any state of facts which may be proved in support of his claim," that claim would not be dismissed (at page 909).

Cogan was cited with approval by the Court of Appeals in Schwartz v. Eaton, 2 Cir., 264 F.2d 195, at page 198, note 5.

In Schwartz, supra, a derivative stockholder's action was brought under sections 7 and 47 of the 1940 Act. The complaint alleged a violation of the Act "and of the ordinary fiduciary obligations of company officers and directors" (264 F.2d at page 196). The relief sought was to undo a transfer, for an accounting of profits and damages to the company.

The action was predicated upon the allegation that the company had failed to register under section 7 of the Act and that, as a consequence, certain transactions were unlawful under section 47 of the Act. See 156 F.Supp. at pages 362, 364.

The Court of Appeals held that the case was within the ambit of section 44.

"In a reasoned decision * * * the district court held that the complaint * * * stated a claim under the Investment Company Act upon which relief can be granted. * * * That such remedies [injunctive and accounting] may be had under the Investment Company Act is made clear by the earlier part of Judge Dimock's decision, D.C.S.D.N.Y., 156 F.Supp. 361; and see Breswick & Co. v. Briggs, D.C.S.D.N.Y., 136 F.Supp. 301; Cogan v. Johnston, D.C.S.D.N.Y., 162 F.Supp. 907." 264 F.2d 196, 198, note 5.

The Cogan and Schwartz decisions illustrate the doctrine of implied liability and private actions based on a statutory violation. There is "nothing novel" about that doctrine. Loss, Securities Regulation (1951) 1033, 1040, 1044, 1060.

While implied liability under the 1940 Act is not *terra incognita*, the problem under that Act, as under the other SEC statutes, is to ascertain limits and define

boundaries. Loss, supra, 1043–1098. This can be done only by the traditional case-by-case process of judicial inclusion and exclusion.

In Taussig v. Wellington Fund, Inc., D.C.D.Del.1960, 187 F.Supp. 179, at page 216, 218, the court declared as "well founded" a private action based on section 35 of the Act, relating to the use of deceptive or misleading name. The defendants in that case unsuccessfully argued: " * * * As far as the statute is concerned, the determination is of the Commission initially * * *, and it is given the right to maintain any necessary court proceedings. No private remedy can be implied from these explicit provisions lodging the right to act in the Commission. 'Further, it is quite clear that this provision of the Investment Company Act was intended to protect investors and not to provide a remedy for the protection of the alleged property right of another in the word or words being used.'"

The court, in overruling the contention that the plaintiffs did not have standing to assert the alleged violation, said:

"Violation of a federal statute may accord a private litigant a remedy by implication notwithstanding the absence of specific statutory authority conferring upon the injured the right to redress statutory wrongs, for the common law will supply a remedy where the statute is silent. (Bell v. Hood, 1946, 327 U.S. 678, 684, 66 S.Ct. 773, 90 L.Ed. 939. Restatement of the Law of Torts, Vol. 2, § 286.)

"The intention to create civil liability is presumed unless a contrary legislative intent is to be inferred from the whole purview of the Act. (Narramore v. Cleveland, C. C. & St. L. R. Co., 6 Cir., 1899, 96 F. 298, 300)

"Section 286 of the Restatement of the Law of Torts, Vol. 2, p. 752 provides:

" 'The violation of a legislative enactment by doing a prohibited act, or by failing to do a required act, makes the actor liable for an invasion of an interest of another if:

" '(a) the intent of the enactment is exclusively or in part to protect an interest of the other as an individual; and

" '(b) the interest invaded is one which the enactment is intended to protect; and

" '(c) where the enactment is intended to protect an interest from a particular hazard, the invasion of the interest results from that hazard; and

" '(d) the violation is a legal cause of the invasion, and the other has not so conducted himself as to disable himself from maintaining an action'. * * *" 187 F.Supp. at page 217.

"It is one thing to say that the three [SEC] statutes in question were drafted with the overall intent to protect the investing public but something quite different to conclude a competitor has no standing to prosecute a violation of these enactments. Clearly, the Commission would have been justified to launch an investigation into the alleged improper practices on the complaint of plaintiffs. * * *

*     *     *     *     *     *

"In the present context, federal statutory remedies accorded by implication must be held to extend to persons other than the investing public in certain compelling instances. To begin with, in particular circumstances the investors' interest is peculiarly served by according remedial rights by implication to persons other than investors. The administrative agency exercising appropriate discretion may decide not to institute the required action to protect the injured litigants' interests. Further, there may be no remedy conferred by State law, or in the case of an enterprise engaged in multi-state activities, local relief

may be entirely inadequate. The crux of the matter is, plaintiffs are not acting as private attorneys general, or as a special representative of the Commission. Plaintiffs are in Court in an attempt to vindicate the rights and protections which they claim are secured to Wellington Fund by virtue of Federal law." At page 219.

The matter of implied private actions will be further considered in the following discussion of this Court's conclusion that the action at bar is brought to enforce a liability, created by section 37 of the Act, for the unlawful and willful conversion of the moneys or assets of the Fund.

Section 37 of the Act relevantly provides:

"Sec. 37. Whoever steals, unlawfully abstracts, unlawfully and willfully converts to his own use or to the use of another, or embezzles any of the moneys, funds, securities, credits, property, or assets of any registered investment company shall be deemed guilty of a crime, and upon conviction thereof shall be subject to the penalties provided in section 49 * * *."

■ Although the Act does not explicitly confer a private remedy for a violation of section 37, the great weight of authority demonstrates that a private right of action must be implied.

Each of the SEC statutes, of which the 1940 Act is one, is variously designed for the protection of the investing public. Each of said statutes commands or forbids certain acts or conduct in order to achieve this objective. In comparatively few instances, express provision is made for a right to private relief, as distinguished from criminal and administrative sanctions. [The 1933 Act: 15 U.S. C.A. §§ 77k, 77l, 77o, 77p. The 1934 Act: 15 U.S.C.A. §§ 78i(e), 78p(b), 78r, 78t. The Public Utility Holding Company Act of 1935: section 79p, 79q(b). The Trust Indenture Act of 1939: section 77www. The 1940 Act: 15 U.S.C.A. § 80a–29(f)].

Numerous decisions have held that—notwithstanding the absence of such private-remedy provisions—violations of the SEC statutes create a private right of action in favor of the persons sought to be protected by those statutes and against the violators. Loss, supra, 1043, et seq.

Private remedies have been implied even though the same statute expressly provided for other private remedies. The rationale is phrased as follows in A. C. Frost & Co. v. Coeur D'Alene Mines Corp., 1941, 312 U.S. 38, 43, 61 S.Ct. 414, 417, 85 L.Ed. 500:

"Courts have often added a sanction to those prescribed for an offense created by statute where the circumstances fairly indicated this would further the essential purpose of the enactment; * * *."

In Texas & Pacific Ry. Co. v. Rigsby, 1916, 241 U.S. 33, 39, 36 S.Ct. 482, 484, 60 L.Ed. 874, the Court declared:

"A disregard of the command of a statute is a wrongful act, and where it results in damage to one of the class for whose special benefit the statute was enacted, the right to recover the damages from the party in default is implied * * *."

Accord: Fairport, P. & E. R. Co. v. Meredith, 1934, 292 U.S. 589, 596–597, 54 S. Ct. 826, 78 L.Ed. 1446; Reitmeister v. Reitmeister, 2 Cir., 1947, 162 F.2d 691, 694; Abounader v. Strohmeyer & Arpe Co., 1926, 243 N.Y. 458, 465, 466, 154 N.E. 309; Restatement, Torts (1934), sections 286–288.

In Bell v. Hood, 1946, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939, the action was for damages against defendants who were FBI agents charged with having detained the plaintiffs and having searched their premises in violation of the Fourth and Fifth Amendments. The district court's dismissal of the action for want of federal jurisdiction had been affirmed by the Court of Appeals, 9 Cir., 150 F.2d 96. In reversing, the Supreme Court (per Mr. Justice Black), expounded principles bearing directly on the case

at bar. At page 681 of 327 U.S., at page 775 of 66 S.Ct., the Court said:

"Whether or not the complaint as drafted states a common law action in trespass made actionable by state law, it is clear from the way it was drawn that petitioners [plaintiffs] seek recovery squarely on the grounds that respondents violated the Fourth and Fifth Amendments. * * * It cannot be doubted therefore that it was the pleaders' purpose to make violation of these constitutional provisions the basis of this suit. Before deciding that there is no jurisdiction, the District Court must look to the way the complaint is drawn to see if it is drawn so as to claim a right to recover under the Constitution and laws of the United States. For to that extent, 'the party who brings a suit is master to decide what law he will rely upon and * * * does determine whether he will bring a "suit arising under" the * * * [Constitution or laws] of the United States by his declaration or bill.'"

Mr. Justice Black continued (327 U.S. at pages 681–682, 66 S.Ct. at page 776):

"[W]here the complaint, as here, is so drawn as to seek recovery directly under the Constitution or laws of the United States, the federal court, but for two possible exceptions later noted, must entertain the suit. "* * * The previously carved out exceptions are that a suit may sometimes be dismissed for want of jurisdiction where the alleged claim under the Constitution or federal statutes clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous."

Mr. Justice Black declared (327 U.S. at page 684, 66 S.Ct. at page 777):

"Moreover, *where federally protected rights have been invaded, it has been the rule from the beginning that courts will be alert to ad-just their remedies so as to grant the necessary relief.*" (Emphasis added.)

■ Implied rights of action are not contingent upon statutory language which affirmatively indicates that they are intended. On the contrary, they are implied unless the legislation evidences a contrary intention. For example, the refusal of the courts to imply a private remedy under the National Labor Relations Act was based upon the fact that the statute by its terms gave the administrative agency the exclusive power to prevent unfair labor practices, and the Congressional reports specifically stated that no private right of action was contemplated. See Amalgamated Utility Workers v. Consolidated Edison Co., 1940, 309 U.S. 261, 267, 269, 60 S.Ct. 561, 84 L.Ed. 738.

In a case involving purchases of securities effected in violation of the anti-fraud rules of the 1934 Act, Matheson v. Armbrust, 9 Cir., 1960, 284 F.2d 670, 673, the court held that, where plaintiff has a choice between suing in state or federal court to recover damages for the fraud which defendant perpetrated, "the long-established principle is applicable, that 'the party who brings a suit is master to decide what law he will rely upon.' The Fair v. Kohler Die & Specialty Co., 228 U.S. 22, 25, 33 S.Ct. 410, 411, 57 L.Ed. 716." Accord: see Reed v. Riddle Airlines, 5 Cir., 1959, 266 F.2d 314, 315; Speed v. Transamerica Corp., D.C. D.Del.1951, 99 F.Supp. 808, modified and affirmed 3 Cir., 1956, 235 F.2d 369.

Under the 1933 Act, which contains a specific civil recovery provision, a private cause of action has been implied for violations of the broader anti-fraud provisions of the statute, despite a narrower clause that expressly exempted the particular bonds from the misrepresentation provision. Thiele v. Shields, D.C.S.D.N. Y.1955, 131 F.Supp. 416, 419.

The principle of implied liability was applied directly in Fischman v. Raytheon Mfg. Co., 2 Cir., 1951, 188 F.2d 783, involving a stockholders' action under section 10(b) of the 1934 Act, which forbids

the use of fraudulent devices in connection with the purchase and sale of securities. No remedy is expressly granted by that provision to the person aggrieved. The court, per Frank, J., held (at page 787):

"Section 10(b) [of the 1934 Act], to be sure, does not explicitly authorize a civil remedy. Since, however, it does make 'unlawful' the conduct it describes, it creates such a remedy."

Accord: Hooper v. Mountain States Securities Corp., 5 Cir., 1960, 282 F.2d 195, 200–201; Errion v. Connell, 9 Cir., 1956, 236 F.2d 447, 453–455; Fratt v. Robinson, 9 Cir., 1953, 203 F.2d 627, 37 A.L.R. 2d 636; Slavin v. Germantown Fire Ins. Co., 3 Cir., 1949, 174 F.2d 799, 805–806; Osborne v. Mallory, D.C.S.D.N.Y.1949, 86 F.Supp. 869, 879; Kardon v. National Gypsum Co., D.C.E.D.Pa.1946, 69 F.Supp. 512; Id., D.C.E.D.Pa.1947, 73 F.Supp. 798.

Another leading case is Baird v. Franklin, 2 Cir., 1944, 141 F.2d 238, certiorari denied 1944, 323 U.S. 737, 65 S.Ct. 38, 89 L.Ed. 591, interpreting section 6(b) of the 1934 Act which, as judicially construed, makes it the duty of every stock exchange to expel or discipline members for unethical conduct. No private right of action is provided for violation of this duty. In Baird v. Franklin, 2 Cir., 141 F.2d 238, at page 245, sustaining a private right of action, it was said:

"The fact that the statute provides no machinery or procedure by which the individual right of action can proceed is immaterial. It is well established that members of a class for whose protection a statutory duty is created may sue for injuries resulting from its breach and that the common law will supply a remedy if the statute gives none. (Citing cases.)"

Although the pertinent language of the Baird case appears in the dissenting opinion of Judge Clark, the full court agreed with this part of his holding. It has since repeatedly been cited with approval. See Goldstein v. Groesbeck, 2 Cir., 1944, 142 F.2d 422, 427, 154 A.L.R. 1285; Slavin v. Germantown Fire Ins. Co., 3 Cir., 1949, 174 F.2d 799, 805; Fratt v. Robinson, supra, 203 F.2d at pages 631–632.

The same principle has been applied to a variety of other prohibitions, such as sections 7(a), 11(d) and 17(a) of the 1934 Act and section 4(a) (2) of the Public Utility Holding Company Act of 1935. Although none of these sections provides for a private right of action, the violation of each has been held, by necessary implication, to grant such a right to the parties for whose protection the statute was intended. Goldstein v. Groesbeck, 2 Cir., 1944, 142 F.2d 422, 425–427, 154 A.L.R. 1285, certiorari denied 1944, 323 U.S. 737, 65 S.Ct. 36, 89 L.Ed. 590; Remar v. Clayton Securities Corp., D.C.Mass.1949, 81 F.Supp. 1014, 1017; Appel v. Levine, D.C.S.D.N.Y.1948, 85 F.Supp. 240; Hawkins v. Merrill, Lynch, Pierce, Fenner & Beane, D.C.W.D.Ark. 1949, 85 F.Supp. 104, 121.

Section 47 of the 1940 Act was copied verbatim from section 26(b) of the Public Utility Holding Company Act of 1935, 15 U.S.C.A. § 79z(b). Both sections provide, in substance, that any stipulation waiving compliance with any provision of the statute or Commission rule shall be void; and that any contract or performance thereof violating the statute or rule shall be void. The interpretation of this provision in Goldstein v. Groesbeck, 2 Cir., 1944, 142 F.2d 422, 154 A.L.R. 1285, certiorari denied 323 U.S. 737, 65 S.Ct. 36, 89 L.Ed. 590, illuminates in depth the problem at bar.

In Goldstein v. Groesbeck, supra, a minority stockholder brought a double derivative action for an accounting of profits. The gravamen of the complaint was certain contracts entered into in violation of section 4(a) (2) of the Public Utility Holding Company Act of 1935, 15 U.S.C.A. § 79d(a) (2). This section made it unlawful for an unregistered holding company to enter into service and construction contracts with any public utility company. The Court of Ap-

peals upheld "the sufficiency of the complaint" (142 F.2d at page 425).

The court, per Clark, J., said:

"The present action is surely to enforce a duty created by the Act, since but for the Act the payments under the service and construction contracts would be innocuous enough; *and the words 'any liability or duty' are clearly broad enough to include any breaches of duty causing injury or loss to private persons.* See Baird v. Franklin, 2 Cir., 141 F.2d 238" (142 F. 2d at page 425.)

"Violation being thus established, § 26(b), 15 U.S.C.A. § 79z(b), in express terms declares the contracts void. It should follow that the operating companies are entitled to a refund, for no other result can fulfill the expressed purpose of the Act of protecting subsidiaries from the overreachings of holding companies" (at page 426.)

"Defendants object that § 4(a) (2) cannot be enforced by a private party because its proscription of service contracts is made as a penalty for the failure of the holding company to register under § 5 of the Act, 15 U.S.C.A. § 79e. Electric Bond & Share Co. v. S. E. C. [2 Cir., 92 F.2d 580], supra. Since some penalties can be enforced by private parties, the label is in any event inconclusive. Life & Casualty Ins. Co. of Tennessee v. McCray, 291 U.S. 566, 574, 54 S.Ct. 482, 78 L.Ed. 987, and cases cited therein. If private parties were to be held precluded from thus relying upon the Act, on the theory that its terms constituted a penalty, it would seem to follow that the private operating companies must pay the amounts due under the contracts, even though they were declared illegal—a result hardly consonant with the policy of the legislation. Furthermore, the analogy of the Securities Exchange Act is again useful. Private enforcement of § 29(b) of that statute has been permitted, Geismar v. Bond & Goodwin, Inc. [D.C., 40 F.Supp. 876] supra, *while we have recently upheld broadly the private rights of action impliedly granted by the Securities Exchange Act,* Baird v. Franklin, 2 Cir., 141 F.2d 238; and cf. Charles Hughes & Co. v. S. E. C., 2 Cir., 139 F.2d 434, certiorari denied [321 U. S. 786] 64 S.Ct. 781 [88 L.Ed. 1077]. *As we have pointed out in those cases, we think a denial of a private right of action to those for whose ultimate protection the legislation is intended leaves legislation highly publicized as in the public interest in fact sadly wanting, and even delusive, to that end"* (at page 427). (Emphasis supplied.)

In Remar v. Clayton Securities Corp., D.C.D.Mass.1949, 81 F.Supp. 1014, it was held that an investor has a cause of action against a broker who arranged loans in violation of the margin requirements under the 1934 Act. Judge Wyzanski pointed to section 27 of the 1934 Act which gives to the federal court jurisdiction over "suits in equity and actions at law brought to enforce any liability or duty created by this Act," and concluded (at pages 1017–1018):

" * * * within the meaning of § 27, plaintiff is enforcing a liability created by the Securities and Exchange Act. To be sure, the statute created the liability by implication, not by express words. But once the liability was created, its extent was to be measured by * * * a federal rather than a state common law. (Citations omitted.) Suits to enforce a liability having such federal ancestry should be granted credentials of legitimacy in connection with this jurisdictional section of the statute."

In implying private remedies under the 1933 and 1934 Acts, Judge Leibell in Osborne v. Mallory, D.C.S.D.N.Y.1949,

86 F.Supp. 869 at pages 878-879, pointed out:

"Section 22(a) of the Securities Act of 1933 * * * gives the Federal district courts jurisdiction over suits in equity and actions at law brought to enforce any liability or duty 'created by this subchapter', * * * which includes § 17.

"Section 27 of the Securities Exchange Act of 1934 * * * gives a Federal district court jurisdiction over 'violations of this chapter', i. e. under the 1934 Act, and over violations of the Rules and Regulations issued by the Securities and Exchange Commission pursuant to the provisions of said Act. *The word 'violation' is not limited to a criminal case; it includes also civil litigation.* Grossman v. Young, D.C., 70 F.Supp. 970.

"Even though there is no specific section of the 1933 Act creating liability under § 17 other than the language of § 17 itself, or in the 1934 Act in relation to § 10(b) of that Act other than the language of § 10(b) itself, nevertheless *it has been held that a civil liability is implied and a remedy is available under the Acts for violations of their provisions,* and that an action may be brought in the appropriate courts to enforce that liability. * *

"That a violation of § 10(b) of the Securities Exchange Act of 1934 implicitly creates a civil liability for which a remedy is available in the Federal courts, has been held in the following cases: [Citations omitted.]"

The Osborne case has been cited with approval in such cases as Fischman v. Raytheon Mfg. Co., 2 Cir., 1951, 188 F.2d 783, 787, and Northern Trust Co. v. Essaness Theatres Corp., D.C.N.D.Ill. 1952, 103 F.Supp. 954, 964.

Summarizing this doctrinal development and application, Loss, supra, correctly states (pp. 1043, 1045):

"7. Implied Liabilities

"The most surprising development in the whole area of civil liabilities under the federal statutes has been the recognition in recent years of what might be termed the implied liabilities. There is good reason to believe that these may turn out to be far more significant than the express liabilities which Congress created. And, when this development in the field of remedies is combined with the changes in the substantive law of fraud and misrepresentation which the Commission and the courts are evolving under these statutes and rules, the effect on the general law governing securities transactions and relations between management and security holders is not inconsiderable. Because of the almost universal use of the mails and interstate instrumentalities in commercial transactions, the net result may well be to cut deeply into areas which have been traditionally reserved for state law in this country.

"(a) The Bases of Liability

"The implied liabilities under these statutes rest on two bases. One is the provision of Section 29(b) of the Exchange Act—substantially repeated in the Holding Company, Investment Company and Investment Advisers Acts—to the effect that every contract made in violation of the statute or any rule thereunder, as well as every contract whose performance will involve such a violation, shall be 'void' as regards the rights of (1) any violator and (2) any person, not a party to the contract, who acquires any right thereunder with actual knowledge of the facts resulting in the violation. * * *

"The other basis of the implied liabilities is the common-law tort doctrine of private action based on violation of a statute. * * * It is all a matter of 'legislative intention.' The courts have to be sure they are

only 'finding' and not 'making' the law. * * *

"The philosophy—the growth of the law by the interaction of legislators and judges—has been thoroughly discussed."

As noted, the foregoing principles are exemplified by the decisions in the Cogan, Schwartz, and Taussig cases, where they were applied to sections 7 and 35 of the 1940 Act, despite the absence of any provision explicitly granting a private remedy or creating a private liability.

■ The same conclusion is applicable to violations of section 37 of the 1940 Act, one of the provisions herein involved. Section 37 makes it a federal crime willfully to convert the moneys or assets of a registered investment company. The Fund is such a company. It is a member of the class for whose protection section 37 was designed. Therefore, the Fund has an implied remedy under section 37 for the alleged conversion of its moneys. The Fund is in the hands of the alleged wrongdoers. Consequently, as stockholders, plaintiffs may enforce the right on behalf of the Fund. Federal jurisdiction under section 44 necessarily follows.

Doyle v. Milton, D.C.S.D.N.Y.1947, 73 F.Supp. 281, cited by defendants, does not support their position in the case at bar. In Doyle, the plaintiffs claimed, *inter alia* that the defendants had obtained control of The Equity Corporation, an investment company, through pyramiding, contrary to the policy of section 1(b) (4) of the Act [15 U.S.C.A. § 80a–1(b) (4)]; and they demanded the "disfranchisement" of the defendants ["* * * restraining the defendants from * * * voting the more than one million shares of Equity common stock owned by Oceanic Trading Company, Inc." at page 282]. The court found that the omission of "the power to disfranchise" was deliberate. Accordingly, it refused to overrule the Congressional mandate (73 F.Supp. at page 285).

The conclusion reached in the Doyle case has no bearing on the availability of the conventional remedy of accounting sought herein and which the Court of Appeals for this circuit has already sustained (Schwartz v. Eaton, supra, 264 F.2d at page 198, note 5).

■ Considered as a pleading whose factual allegations and the inferences therefrom are deemed admitted *arguendo*, the complaint herein sets forth a legally sufficient claim for a willful conversion of the Fund's moneys and assets, in violation of section 37 of the 1940 Act. To recapitulate: the complaint charges that the fees and compensation paid by the Fund's directors to the Management Company were excessive and were determined by a grossly unfair method; that the Fund's directors, affairs, and business were dominated and controlled by the Management Company and the latter's majority stockholders and principal officers, Bullock and Clark; that, in determining the Management Company's compensation, the Fund's directors abdicated their functions and acted with arbitrariness, collusion, gross negligence or reckless disregard of their duty; that material facts bearing on the investment advisory fees arrangements between the Fund and the Management Company were falsely stated and misrepresented to the Fund's stockholders and that other material facts were concealed from them; and that the foregoing facts constituted an unlawful and willful conversion.

As a matter of pleading, it is immaterial "whether these charges be called 'allegations of fact' or 'mere conclusions of the pleader.'" See United States v. Employing Plasterers Ass'n, 1954, 347 U.S. 186, 188, 189, 74 S.Ct. 452, 454, 98 L.Ed. 618.

For present purposes, it is not necessary to adjudicate the nature of the claim with respect to the salesload or commissions received by the Management Company. Since the complaint states a claim under the 1940 Act, section 37, on which relief can be granted in regard to the advisory fees (whose payment by

the Fund is indisputable), the court has jurisdiction; and the complaint cannot be dismissed as legally insufficient.

■ The directors and the investment adviser of an investment company are fiduciaries. Aldred Inv. Trust v. Securities and Exchange Commission, 1 Cir., 1954, 151 F.2d 254, 260, 261, certiorari denied 326 U.S. 795, 66 S.Ct. 486, 90 L.Ed. 483; Taussig v. Wellington Fund, D.C.Del.1960, 187 F.Supp. 179, 216. See Greene, Fiduciary Standards of Conduct Under The Investment Company Act of 1940, 28 Geo. Washington L.Rev. 266, 272–274 (1959).

■ The willful misapplication of corporate funds by fiduciaries constitutes a conversion. That the misapplication occurred under the guise of a contract or that it was approved by directors who themselves wrongfully and knowingly participated in the transaction is immaterial. See Upson v. Otis, 2 Cir., 1946, 155 F.2d 606, 610–611; Flannery Bolt Co. v. Flannery, D.C.W.D.Pa.1935, 16 F. Supp. 803, 804, 807, affirmed 3 Cir., 1936, 86 F.2d 43; Von Arnim v. American Tube Works, 1905, 188 Mass. 515, 516, 519–520, 74 N.E. 680; Bingham v. Ditzler, 1941, 309 Ill.App. 581, 582, 33 N.E.2d 939; Smith v. Dunlap, 1959, 269 Ala. 97, 111 So.2d 1, 4.

■ The term "converts," as used in section 37 of the Act, is to be given its traditional meaning. See Morissette v. United States, 1952, 342 U.S. 246, 263, 72 S.Ct. 240, 96 L.Ed. 288. It is a technical term and, as such, has the same connotation in a criminal statute as it has in the law of torts. United States v. Morse, C.C.S.D.N.Y.1908, 161 F. 429, 435, affirmed 2 Cir., 1909, 174 F. 539, certiorari denied, 1909, 215 U.S. 605, 30 S.Ct. 406, 54 L.Ed. 346. Cf. United States v. Britton, 1882, 107 U.S. 655, 666–667, 2 S.Ct. 512, 27 L.Ed. 520; Johnson v. United States, 4 Cir., 1938, 95 F.2d 813, 816; People v. Marcus, 1933, 261 N.Y. 268, 277–279, 185 N.E. 97; United States v. Breese, D.C.W.D.N.C.1904, 131 F. 915, 925–926, reversed on other grounds, 4 Cir., 1906, 143 F. 250.

The defendants' argument—that the 1940 Act does not regulate the size of investment advisory fees and salesload (except for section 27, not here relevant) —is beside the point. The absence of mechanical statutory limits for the fees or commissions does not prevent the application of section 37, once its factual prerequisites are shown to exist. The size of the payments received by the defendants is only an evidentiary, not an operative, fact. The size of the payments considered together with other material and related evidentiary circumstances (such as the use of false and misleading statements, collusion, the relationship of the size of payments to the value of the services allegedly rendered) may establish the ultimate fact of deliberate appropriation and the conclusion of willful conversion.

The law-enforcement aspects of private litigation based on statutory violations have not escaped the clear notice of the courts. See Smolowe v. Delendo Corporation, 2 Cir., 1943, 136 F.2d 231, 241, 148 A.L.R. 300, certiorari denied 1943, 320 U.S. 751, 64 S.Ct. 56, 88 L.Ed. 446 [recovery of attorney's fees implied under section 16(b) of the 1934 Act, although attorney's fees were made expressly recoverable under other sections for other violations]; Spirt v. Bechtel, 2 Cir., 1956, 232 F.2d 241, 253 (dissent by Judge Frank).

The implication herein of a private civil remedy under section 37 of the 1940 Act (and under other sections, as will hereinafter be shown) is only a specific application to securities legislation of a general principle recognized and expounded in such cases as Fitzgerald v. Pan American World Airways, 2 Cir., 1956, 229 F.2d 499, 501; Spirt v. Bechtel, 2 Cir., 1956, 232 F.2d 241, 243 [Judge Swan's opinion], at pages 248–251 [Judge Lumbard's concurring opinion], at pages 251–252 et seq. [Judge Frank's dissenting opinion].

■ Privity of contract between the plaintiffs and the defendants is not a fixed condition precedent to the implica-

tion of a private remedy for a statutory violation that injured the plaintiffs, members of the protected class. In that situation, privity is not an ultimate or operative fact. It is an evidentiary fact to be considered in conjunction with other material facts in determining whether the relationship (such as it is) between the plaintiffs and the defendants and the nature of the particular acts and transactions involve the duty created by the statute. *Loss, Securities Regulation* (1951) 1064; (1955 Supplement) 371–372. Cf. *Joseph v. Farnsworth Radio & Television Corp.*, D.C.S.D.N.Y.1951, 99 F.Supp. 701, affirmed 2 Cir., 1952, 198 F.2d 883, per curiam, Frank, J. dissenting.

The relationship between the plaintiffs and the defendants, the nature of the defendants' participation in the challenged transactions, and the plaintiffs' reliance upon the defendants' acts may vary. The relationship may be as direct as that of vendor and purchaser or that of a corporation and its active directors who personally profited. Other relationships that shade off into remote and indirect connections may be hypothesized.

In the case of a corporation, for example, the defendant-directors may not have personally participated or profited from the allegedly wrongful acts. Such suppositious circumstances may present, in a particular context, a question of vicarious or per se liability of directors. *Brouk v. Managed Funds, Incorporated*, 8 Cir., 1961, 286 F.2d 901 [where the court refused to imply such vicarious or per se directorial liability under the 1940 Act].

The problem of degree and drawing the line is not unlike that posed in the field of causation and other jural interrelationships. See *Gully v. First National Bank*, 1936, 299 U.S. 109, 118, 57 S.Ct. 96, 81 L.Ed. 70.

In the case at bar, there is no such problem at this stage, where only the sufficiency of the complaint as a pleading is involved. The complaint sufficiently sets forth a claim, implied un-

der section 37, over which this court has jurisdiction by virtue of section 44.

Additional independent grounds of federal jurisdiction will now be discussed.

■■■ The complaint alleges that defendants issued proxy statements that were materially false and misleading; that, as a consequence, the Fund's stockholders were induced to forego the exercise of the absolute and personal statutory right given to them by the Act to terminate at any time the advisory-and-management contracts between the Fund and the Management Company; that the defendants' use of the false and misleading proxy statements constituted a violation of section 15(a) (3), section 20(a) and related Commission proxy rules, and section 34(b) of the Act; and that the renewal of the advisory-and-management contract voted by the defendants and their failure to terminate said contract were, under the circumstances, violative of section 47(b) because they were effectuated by means violative of the Act.

The plaintiffs' and the Commission's arguments in relation to the legal sufficiency of the complaint based upon the foregoing allegations are meritorious. A sufficient claim is so pleaded. This conclusion follows with clear logicality from the interacting relationship between the above-cited sections of the Act.

Section 20(a) of the Act makes it "unlawful" for any person to solicit a proxy (in respect of any security of which a registered investment company is the issuer) in contravention of such rules and regulations as the SEC may prescribe in the public interest or for the protection of investors.

Rule 20a–1 of the SEC, issued pursuant to the 1940 Act, provides that no person shall solicit a proxy in respect of any security of which a registered investment company is the issuer, except upon compliance with the proxy rules adopted pursuant to section 14(a) of the 1934 Act.

Rule X–14A–9, 17 C.F.R. 240.14a–9 (adopted pursuant to section 14(a) of

the 1934 Act) forbids the solicitation of proxies by means of any proxy statement which is materially false or omits to set forth any material fact necessary in order to make the statements therein not false or misleading.

■ Section 34(b) of the Act makes it "unlawful" for any person to state any material untruth in a document filed or transmitted pursuant to the Act. The same section makes it "unlawful" to omit from any such document any fact necessary in order to prevent the statements made therein from being materially misleading. Proxy statements are among the documents envisaged by section 34(b).

Since the Act and the regulations thereunder make the use of false proxy statements "unlawful," the persons for whose protection the Act was designed are entitled to relief from the alleged wrongdoers.

■ The proxy provisions of the Act are designed for the protection of investors (sections 1(b) and 20(a) of the Act). Plaintiffs, as stockholders of the Fund, are such investors. They are, therefore, entitled to the protection of sections 20(a) and 34(b) of the Act through a private right of action against the alleged wrongdoers.

A private right of action under the proxy regulations of the 1934 Act is well-established. Dann v. Studebaker-Packard Corp., 6 Cir., 288 F.2d 201; Central Foundry Company v. Gondelman, D.C.S.D.N.Y.1958, 166 F.Supp. 429 [injunction to restrain exercise of proxies]; Rosen v. Alleghany Corp., D.C.S.D.N.Y. 1955, 133 F.Supp. 858, 867–869 [injunction]; Horwitz v. Balaban, D.C.S.D.N.Y. 1949, 112 F.Supp. 99, 102 [injunction to restrain issuance of additional stock]; Phillips v. The United Corporation, 3 Securities and Exchange Commission Jud. Dec. 1483, 1493ff, 1507 (S.D.N.Y.1947) [injunction]; Tate v. Sonotone Corp., 3 Securities and Exchange Commission Jud.Dec. 1342 (S.D.N.Y.1947) [motion for a temporary restraining order].

The principle has been recognized, even in the cases where relief was denied on factual grounds. Mack v. Mishkin, D.C.S.D.N.Y.1959, 172 F.Supp. 885 [to set aside an election]; Gaudiosi v. Franklin, D.C.E.D.Pa.1958, 166 F.Supp. 353, 362, 369 [injunction]; Textron, Inc. v. American Woolen Co., D.C.Mass.1954, 122 F.Supp. 305, 308 [injunction].

■ In the present case, the complaint is cast both in derivative and representative terms. See Goldstein v. Weisman, D.C.S.D.N.Y.1960, 185 F.Supp. 242, 250; 2 Hornstein, Corporation Law And Practice (1959) sections 601–602, 711. A claim may have both derivative and non-derivative aspects; and one does not necessarily preclude the other. See Horwitz v. Balaban, D.C.S.D.N.Y.1949, 112 F.Supp. 99, 102. The present claim may be sustained on both "theories."

■ The strongest additional support for the conclusion that the claim is sufficient is found in the interaction between section 20(a), section 34(b) and section 15(a) (3) of the Act. Under section 15(a) (3), a majority of the stockholders has the right—expressly created by that provision—at any time to terminate an investment advisory contract by giving sixty days' notice. This specific, explicit statutory right would be worthless unless the stockholders have truthful information regarding the circumstances making the continuation or termination of the contract advisable. Sections 20(a) and 34(b) are designed to give them this information. If the information is falsely stated, withheld or materially distorted, the statutory termination right is denied as effectively as if section 15(a) (3) were read out of the Act. To deny the stockholders a private right of action under such circumstances would leave them helpless under the Act in the face of deception and would invite management to flout its duty to tell the truth.

■ The solicitation and the grant of a proxy result in a contract conferring rights and imposing duties upon the proxy holder. A proxy contract procured

in violation of the Act is void under section 47(b) of the Act. Central Foundry Co. v. Gondelman, D.C.S.D.N.Y.1958, 166 F.Supp. 429, 446; Securities and Exchange Commission v. O'Hara Re-Election Committee, D.C.Mass.1939, 28 F.Supp. 523, 525. Civil relief by damages must be granted; otherwise section 47(b) would be an idle legislative gesture. See Kardon v. National Gypsum Co., D.C.E.D.Pa.1946, 69 F.Supp. 512, 514; Goldstein v. Groesbeck, supra, 142 F.2d at pages 426–427.

Section 47(b), in connection with section 20(a) of the Act, creates a civil right of action against the alleged violators and in favor of those protected by the Act—the plaintiffs and the other shareholders of the Fund.

Defendants rely heavily upon Howard v. Furst, 2 Cir., 1956, 238 F.2d 790, certiorari denied 353 U.S. 937, 77 S.Ct. 814, 1 L.Ed.2d 759. In reliance on that decision, defendants argue that plaintiffs have no derivative claim based upon defendants' alleged violation of the SEC proxy rules. Moreover, defendants contend that plaintiffs have no individual (and hence no representative) right of action because the injuries alleged in the complaint were only those of the Fund, not of the plaintiffs and their fellow shareholders.

The foregoing defense arguments do not impress the court for several reasons now to be discussed.

Howard v. Furst, supra, involved a derivative action to have certain proxies given by stockholders declared void, and to have a consummated sale rescinded or to have damages paid to the corporation. Jurisdiction was asserted under section 27 of the 1934 Act. A proxy statement had been mailed, soliciting the votes of the stockholders in favor of the then pending proposed sale. Plaintiff alleged that the proxy statement was mailed on November 3, 1955 for a meeting to be held on November 28, 1955. The action was commenced on November 23, 1955, but no application was made for preliminary injunctive relief. The sale was affirmed and consummated in due course. The action was against the corporation's directors and officers and the purchaser of the corporate assets. The complaint charged the defendant-directors and officers with waste of corporate assets, breach of their fiduciary duties and self-profit, and sending out a false or misleading proxy statement. The latter act was alleged to have been committed in violation of the 1934 Act and the proxy rule thereunder, Rule X–14A–9.

District Judge Walsh granted defendants' motion to dismiss the complaint for lack of jurisdiction. D.C.S.D.N.Y. 1956, 140 F.Supp. 507. Judge Walsh held that the plaintiff had an implied *representative* claim under the 1934 Act and Rule X–14A–9, but not a *derivative* claim as set forth in the complaint. The Court of Appeals affirmed and expressly "left open the question of whether and to what extent section 14(a) [the proxy provision of the 1934 Act] may be construed as creating substantive rights in an individual stockholder" 238 F.2d at page 793.

In concluding that the complaint therein did not plead a sufficient federal derivative stockholder's claim, the court reasoned that the 1934 Act was not intended to protect the corporation *qua* corporation but only the public interest and investors; and, secondly, that the complaint disclosed a *non-federal claim* for directors' liability based on corporate waste and mismanagement without more and that the proxy allegations premised on the 1934 Act and regulation were nothing but a federal curlicue attached to the State-claim in an attempt to create a colorable federal question.

Howard v. Furst is, therefore, to be distinguished from the present case in the following basic respects:

1. Howard v. Furst was decided under the 1934 Act, whereas the case at bar is brought under the 1940 Act. The 1940 Act, regulating in depth a particular industry, is much more comprehensive in thrust and scope than the 1934 Act. In certain major respects, the 1940

Act operates as a corporation law for investment companies. In sharp contrast, the 1934 Act (like the 1933 Act) regulates one phase,—the purchase and sale of corporate securities. The distinction is between commodity regulation and industry regulation. The protective reach of the latter extends to the corporation as well as the stockholder and the public generally.

In light of the distinctive character of investment companies and their easy susceptibility to management abuses (e. g., looting of the companies by insiders' using means both crude and subtle), one of the primary objectives of the 1940 Act was the protection of investment companies as well as investors against the derelictions of investment companies' directors, investment advisers, other fiduciaries, and principal underwriters. To say that the 1940 Act was not intended in part to protect investment companies is to emasculate the statute.

· The 1940 Act, through numerous specific provisions, created an entire pattern of prescriptions and prohibitions with respect to the organization of investment companies, the composition of their boards of directors, voting rights, the terms and conditions of contracts entered into by investment companies and their investment advisers and managers and principal underwriters. Manifestly, the overall policy, objectives and mechanism of the 1934 Act and the 1940 Act are widely different.

The rationale of Howard v. Furst, involving as it did the narrower policy and objective of the 1934 Act, is not to be extended to the 1940 Act in so far as that decision held that the 1934 Act was not intended to include the corporation among those to be protected.

2. The complaint herein sets forth a substantial federal claim not, as in Howard v. Furst, "a mere excrescence or superfluity, tacked onto" a non-federal claim. The allegations herein concerning the false and misleading proxy statements not only plead violations of the 1940 Act's proxy provision and regulation, but also its effect in causing the stockholders to forego the exercise of their absolute statutory right—a *sui generis* right created by the 1940 Act—to terminate the investment advisory contract at any time.

This contract, providing for investment advice and management of the company, is a major area of the Act's concern. Approval or continuation of such a contract secured, directly or indirectly, by false or misleading proxy statements strikes at basic statutory protection for investors and the company.

Furthermore, the falsity of the proxy statements may invalidate the election of the Fund's directors and their annual extention of the investment advisory contract as between the parties participating in such derelictions. The Act invalidates, as between participants, any contract and its performance if violative of the statute or regulations thereunder.

Finally, it is to be observed that the conditional character of the investment advisory contract—the limitation on its term, the requirement of annual renewal, the right to terminate it "at any time" granted to the investment company's board and its stockholders—was designed by the 1940 Act to protect both the company and the stockholders' right to participate in this vital operation of the company. The foregoing rights are creatures of the 1940 Act; they do not originate out of the State-law.

3. The action at bar is both representative and derivative, whereas the action in Howard v. Furst was only derivative, as the Court of Appeals emphasized. Indeed, the Court of Appeals expressly stated that it was leaving open the question whether a representative complaint would be sufficient.

In the present case, plaintiffs have a claim based upon their individual rights as stockholders; and this action is, as noted, both representative and derivative. Whether in a representative or a derivative capacity, plaintiffs herein may invoke the 1940 Act to secure appropriate relief against an investment advisory

contract allegedly renewed by means of defendants' use of false or misleading proxy statements.

The basic purpose of the proxy provisions of the securities acts is to guarantee the right of a stockholder to a proxy statement free of false or misleading information, so that he may intelligently participate in the affairs of his company. The right to an accurate and fair proxy statement is the stockholders', not the corporation's. Plaintiffs seek to void the arrangements and contracts which were made with the aid of allegedly false and misleading proxy material; and thus this action may also be derivative in nature. But it is not exclusively derivative and in at least one important aspect concerns the stockholder directly.

The foregoing discussion has shown that the complaint pleads a sufficient claim based impliedly on section 37 of the Act (with respect to willful conversion) and impliedly on sections 15, 20 and 34 (with respect to transmitted false proxy statements, the stockholders' right to vote, and the Fund's right exercisable through a vote of its board or stockholders to terminate the investment advisory contract at any time). These claims are cognizable in this court under section 44 of the Act.

In addition, the complaint sets forth a sufficient claim with respect to the defendants' breach of certain fiduciary duties based impliedly upon sections 15, 17(h) and (i) and 36, cognizable in this court under section 44 of the Act.

The Act, section 1(b) (2), explicitly declares that one of its purposes is to protect investors against the operation of investment companies in the interest of directors, officers or investment advisers rather than in the interest of stockholders. Such directors, officers and investment advisers are under the fiduciary duty to manage the companies entrusted to their care with a single eye to their best interest, free from any self-dealing. That is the pervasive policy of the Act. As stated in Aldred Inv. Trust v. Securities and Exch. Comm., 1 Cir.,

1945, 151 F.2d 254, 260, certiorari denied 326 U.S. 795, 66 S.Ct. 486, 90 L.Ed. 483:

> "§ 1(b) of the Act, 15 U.S.C.A. § 80a-1(b), in effect codifies the fiduciary obligations placed upon officers and directors of investment companies."

These statutory fiduciary duties have been judicially recognized. Breswick & Co. v. United States, D.C.S.D.N.Y.1955, 134 F.Supp. 132; D.C.S.D.N.Y.1955, 138 F.Supp. 123, reversed on other grounds 1957, 353 U.S. 151, 77 S.Ct. 763, 1 L.Ed. 2d 726:

> "One of the purposes of the Investment Company Act is thus to protect investors in investment companies against the managing of those companies in the interests of persons other than the investors." 134 F.Supp. at page 138.

Regardless of their foundation in the common law, these fiduciary obligations are granted a federal basis resting in the Act, the particular provisions of which will now be considered.

Under section 15, it is unlawful for any person to serve as investment adviser of a registered investment company except pursuant to a written contract which shall continue in effect for a period more than two years from the date of its execution "only so long as such continuance is specifically approved at least annually by the board of directors or by a vote of a majority of the outstanding voting securities of such company." Secondly, such contract to be lawful must provide "that it may be terminated at any time, without the payment of any penalty, by the board of directors * * or by vote of a majority of the outstanding voting securities * * * on not more than sixty days' written notice to the investment adviser." Thirdly, it is unlawful to make, renew or perform an investment advisory contract unless the terms of the contract and any renewal thereof "have been approved (1) by a majority of the directors who are not parties to such contract or agreement or

affiliated persons of any such party, or (2) by the vote of a majority of the outstanding voting securities of such company."

The directors are thus charged by the Act with critically important powers and duties of a specific nature. Each year they must pass upon the extension of the investment advisory contract, unless they refer the decision to the stockholders; they (the directors) have the authority to terminate the contract "at any time" on sixty days' notice; and, when the contract is made or is to be renewed, there must be a majority of the disinterested directors.

The grant of these defined powers, as specified by the Act, carries with it the imposition of corresponding duties. The power to extend the investment advisory contract necessarily carries with it the duty to determine whether or not the extension is desirable and in the best interest of the company. The power to terminate the investment advisory contract necessarily carries with it the duty to keep alert for reasons which might make termination necessary or desirable; and, in the presence of such reasons, to exercise the right of termination. The objectives of the Act would be nullified if the directors were free to extend mechanically the contract without honestly exercising their best judgment. The objectives of the Act would be equally frustrated if the directors were free to close their eyes to any developments making the termination of the contract advisable.

▮ By giving the directors the right to extend and to terminate the contract, the Act necessarily also imposes upon the directors the fiduciary duty to use these powers intelligently, diligently and solely for the interests of the company and its stockholders. These specific fiduciary duties are created by the Act. Their violation subjects the directors to liability, which can be enforced in the federal courts under section 44 of the Act.

▮ The foregoing analysis also applies to the underwriting contract. Section 15(b) of the Act makes it unlawful for any principal underwriter to sell the securities issued by a registered investment company except pursuant to a written contract with the company, whose extension must be approved annually by the board of directors or the stockholders. Section 15(c) provides, in addition, that the board shall not extend the underwriting contract unless a majority of the disinterested (non-affiliated) directors approves. The grant of the power to extend necessarily implies the imposition of corresponding fiduciary obligations.

The court's conclusion is supported by the rationale of Baird v. Franklin, 2 Cir., 1944, 141 F.2d 238. The plaintiffs there had been injured by the embezzlements of one Whitney, a member of the New York Stock Exchange. They sued the Stock Exchange for its failure to impose timely discipline upon Whitney, in violation of section 6(b) of the 1934 Act. Section 6(b), however, merely required the Stock Exchange to adopt rules enabling it to discipline its members for inequitable conduct. Nothing in the language of section 6(b) required the Stock Exchange actually to impose disciplinary measures upon its wrongdoing members. The Stock Exchange argued, therefore, that its failure to expel or suspend Whitney had not violated any duty imposed on it by section 6(b). The Court of Appeals brushed that argument aside (141 F.2d at page 244):

"* * * § 6(b) places a duty upon the Stock Exchange to enforce the rules and regulations prescribed by that section. Any other construction would render the provision meaningless. * * * If all that § 6(b) meant was that every exchange should pass token regulations, incapable of enforcement except at the wish of the exchange itself, there would have been no purpose for its inclusion in the Act. Sections 6(b) and (d) were surely intended to be read together, and the latter makes it clear that the purpose of the requirements of the former is 'to in-

sure fair dealing and to protect investors.' This can be realized only if § 6(b) is construed as imposing the two-fold duty upon an exchange of enacting certain rules and regulations and of seeing that they are enforced."

The court then went on to state that, the violation being clear, the Act itself granted the plaintiffs a right of action (at page 245):

"If § 6(b) here were to be construed as granting no right of action to plaintiffs, the avowed purpose of 'reasonably complete and effective' protection would indeed be a snare and a delusion."

The reasoning of the Baird case applies to section 15 of the 1940 Act. If all that section 15 meant was that the directors must give their annual token approval to the extension of the advisory contract, there would have been no purpose for its inclusion in the Act. The purpose of section 15 was to protect investment companies and their shareholders from selfish mismanagement. This objective can be realized only if section 15 is construed as imposing upon the directors the duty to use diligence and honest judgment in extending the advisory contract from year to year and in giving constant consideration to the possibility of its termination.

The foregoing interpretation of section 15 is likewise supported by the rationale of Roosevelt Field v. Town of North Hempstead, D.C.E.D.N.Y.1949, 84 F.Supp. 456. The plaintiff-Airfield there sued to enjoin the Town from erecting a water tower, which would be a hazard to navigation. The plaintiff predicated its right to sue on the following provision of the Air Commerce Act of 1926, as amended (49 U.S.C.A. § 671):

"The Board shall, by rules and regulations, or by order where necessary, require all persons to give adequate public notice, in the form and manner prescribed by the Board, of the construction or alteration, or of the proposed construction or altera-

tion, of any structure along or near the civil airways where notice will promote safety in air commerce."

All the statute required was that notice be given before the building of a structure near an airport; it contained no provisions authorizing the airport to seek an injunction against the erection of the structure. However, the requirement of notice would have been meaningless without the corresponding right to enjoin; and the court implied that right from the statute (84 F.Supp. at page 459):

"It is not necessary that a federal statute in terms confer a right of suit upon persons intended to be benefited, Texas & Pacific R. R. v. Rigsby, 1916, 241 U.S. 33, 36 S.Ct. 482, 60 L.Ed. 874. And in at least one later case it has been held that rights similar to those here asserted by the plaintiff may be created even by federal regulations, which do not specifically erect rights or impose liabilities, Neiswonger v. Goodyear Tire & Rubber Co., 1929, D.C.N.D. Ohio, 35 F.2d 761. The case seems to be one where it becomes necessary for the district court to assume jurisdiction to determine whether the federal right has been in effect invaded, cf. Bell v. Hood, 1946, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939."

The Roosevelt Field case has been cited with approval in Fitzgerald v. Pan American World Airways, 2 Cir., 1956, 229 F.2d 499, 502, note 3; Laughlin v. Riddle Aviation Co., 5 Cir., 1953, 205 F.2d 948, 949. It illustrates the broad rule: "The implications and intendments of a statute are as effective as the express provisions." Laughlin v. Riddle Aviation Co., supra.

By a parity of reasoning, the conferral of special powers upon the directors by section 15 of the 1940 Act necessarily implies corresponding responsibilities. The implication of those correlative responsibilities is as plausible and warranted as the implication of responsibilities drawn in the Baird case and the Roosevelt Field case.

In the case at bar, the defendant-directors are accused of having extended the investment advisory and the principal underwriting contracts with the defendant-Management Company collusively rather than in the best interest of the Fund and its shareholders. This constitutes the allegation of a violation by defendants of the fiduciary duties imposed by section 15. The liability flowing therefrom is enforceable in this court.

■ Independently of the bases for a federal claim considered above, there is an additional ground for a sufficient federal claim: the totality of the acts of dereliction charged to the defendants constitutes gross misconduct and gross abuse of trust according to the criteria established by and within the meaning of the 1940 Act. A statutory violation is thereby charged; and the claim is cognizable in this court under section 44.

Sections 17(h) and (i) and 36 of the Act provide interpenetrating sanctions against gross misconduct and gross abuse of trust on the part of directors, officers, investment advisers and principal underwriters of registered investment companies. The concern of Congress with such dereliction was manifested by the enactment of:

1. A provision (section 36) authorizing the Commission to sue for an injunction to restrain any director, officer, investment adviser or principal underwriter who "within five years of the commencement of the action" has been "guilty" of "gross misconduct or gross abuse of trust" in respect of any registered investment company for which such person serves as director, officer, investment adviser or principal underwriter. If the Commission's allegations are established, the court is required to enjoin such abuse of trust and such person from acting in such capacity either permanently or for such period as it in its discretion shall deem appropriate.

2. Two provisions [section 17(h) and (i)] invalidating exculpatory provisions in any instrument pursuant to which a registered investment company is "organized or administered." With respect to directors and officers, the forbidden provision is one which purports to protect any director or officer of such company against "any liability to the company or to its security holders to which he would otherwise be subject by reason of willful misfeasance, bad faith, gross negligence or reckless disregard of the duties involved in the conduct of his office" [section 17(h)].

With respect to investment advisers and principal underwriters, the provision which the Act invalidates is one which purports to protect any investment adviser or principal underwriter of such company against "any liability to such company or its security holders to which he would otherwise be subject by reason of willful misfeasance, bad faith, or gross negligence, in the performance of his duties, or by reason of his reckless disregard of his obligations and duties under such contract or agreement" [section 17(i)].

Just as the Act declares that there can be no valid waiver of compliance with the Act [section 47(a)], so it declares that there can be no valid waiver of liability under the Act [section 17(h) and (i)]. Either kind of waiver can have meaningful content only if there is an object of the waiver: in the one case, compliance with the statute; in the other, liability for non-compliance with the statute. An attempt to immunize a possible violator of the statute against liability for his violation was deemed by Congress to be so offensive as to be stricken down as void *ab initio*.

The underlying presupposition of both section 17(h) and section 17(i) is that there may be "liability to the company or to its security holders"—liability by reason of "willful misfeasance, bad faith, gross negligence or reckless disregard of" duties as a director or officer or liability by reason of "willful misfeasance, bad faith, or gross negligence," in the performance of duties as an investment

adviser or principal underwriter, or by reason of "reckless disregard" of "obligations and duties" under the contract for investment advisory services or for principal underwriting.

The reasons for liability specified in section 17(h) and (i) do not include ordinary negligence, mere mismanagement or vicarious fault. The various acts "by reason of which" there may be liability, as enumerated in section 17(h) and (i), may be categorized as "gross misconduct or gross abuse of trust," the rubric employed in section 36.

Section 17(h) and (i) refer explicitly to "liability." Section 36 refers explicitly to a person's being "guilty." These provisions are "instinct with an obligation" (cf. Wood v. Lucy, Lady Duff-Gordon, 222 N.Y. 88, 91, 118 N.E. 214) on the part of directors, officers, investment advisers and principal underwriters not to commit the proscribed acts. Liability and guilt flow only from a breach of an obligation imposed by law. In this case, the obligation was imposed by the 1940 Act.

■ When a statute provides that a described act is "unlawful" (as many of the sections of this Act do) or when it provides that a person who is "guilty" of described acts is subject to being enjoined by the court and forfeiting his office (section 36) or when it provides that a person who is convicted of having committed described acts is subject to criminal penalties (sections 37, 49), the language so employed is equivalent to a declaration that a person is under the duty to abstain from doing the described acts.

■ The federal sanctions were not placed in section 17(h) and (i) and in section 36 for the sole purpose of enforcing exclusively State-created duties as prescribed and defined in multitudinous State corporation laws and their interpretive decisions. The more reasonable view is that the main purpose for placing these elaborate and detailed federal sanctions in this regulatory Act was to enforce compliance with the Act and performance of the duties imposed by the Act.[1]

1. Section 36 imposes upon investment company directors, officers, investment advisers and principal underwriters fiduciary obligations appropriate to their respective trustee and managerial responsibilities in the handling of other people's money. That this is the ineluctable conclusion commanded by an analysis of the evolution and ultimate architecture of the Act is the thesis discussed in the body of this opinion. Because the subject impinges so profoundly upon the future of the Act, amplification of that analysis based upon the recorded legislative history is now footnoted.

The Act contains specific prohibitions against certain transactions and imposes specific disabilities upon directors, all aimed at the more blatant abuses and breaches of trust. Thus, to prevent the wrongs inherent in "self-dealing," "sitting on both sides of the table" or "unloading or dumping" of securities upon the investment company, section 17 of the Act prohibits any transaction either as principal or agent by any affiliated person and the investment company, except to act as a securities broker at the usual commissions.

The intent to impose this fiduciary duty is evident from the fact that this disabil-

ity to consummate these types of transactions transcends the common law which merely subjects the transaction to scrutiny as to fairness.

Similarly, in order to prevent the abuse of "selling stockholders up or down the river" and to prevent investment advisers from profiting by transfers of their trusteeship to others, section 15 of the Act provides that the management contract must contain a provision for its automatic termination upon its assignment.

Since these restrictive provisions were made applicable to a complex industry, it was impossible to anticipate all those proper transactions that might unintentionally but literally be covered by these provisions. Therefore, section 6(c) of the Act created a reservoir of power in the Commission to exempt any person, security or transaction from any section of the Act.

Conversely, in such regulatory legislation, it was not practicable to incorporate specific deterrents for every potential abuse without seriously impeding the operation of the industry. Therefore, with respect to the more subtle abuses —such as those that might arise from a director's representation of conflicting in-

The conclusion—that gross misconduct or gross abuse of trust by a director, officer, investment adviser or principal underwriter of a registered investment

terests or from his lack of independence resulting in the subordination of the stockholders' interest to that of the management—section 36 was a reservoir of fiduciary obligations imposed upon affiliated persons to prevent gross misconduct or gross abuse of trust not otherwise specifically dealt with in the Act.

This vital residuary character of section 36 of the Act is demonstrated by the fact that the original provisions making gross misconduct and gross abuse of trust unlawful were incorporated in section 17 of the bill dealing with "Transactions of certain affiliated persons and underwriters." In the Act, the gross abuse of trust provisions and the embezzlement provisions (which evolved out of the original gross abuse of trust section) were enacted into separate sections (36 and 37) and placed after all the other substantive provisions of the Act.

It has been argued that section 36 does not define any directorial duties and does not substantively affect the duties of investment company directors but provides merely for an application only by the Commission for injunctive relief which must necessarily (according to the argument) be limited to instances of violation of the other specific provisions of the Act. This argument, if accepted, would emasculate section 36 and make it a superfluity, inasmuch as section 42(e) grants the Commission the broadest power to institute proceedings for injunctive relief against any person who has engaged or is about to engage in any act or practice constituting a violation of any provision of the Act. Such enjoined person would be disqualified to act as a director by operation of section 9 of the Act.

The conclusion—that a fiduciary duty was imposed upon directors, etc., by the Act, particularly section 36—is further fortified by the legislative history of sections 10 and 30(e) of the bill. Section 10 of the bill provided for directors who were to be independent of the investment advisers, brokers and principal underwriters of the investment company; and, in addition, that section placed certain persons who occupied a position of conflicting interest with the investment company under a disability to act as directors. Among the persons included in these disabling provisions of the bill were directors of other investment companies not in the same investment company system and directors of certain portfolio companies.

Similarly—in order to prevent a conflict of interest which might arise by a director's trading in the portfolio securities simultaneously with the investment company—section 30(e) of the bill required the director to disclose such trading to the board of directors.

The representatives of the investment company industry vigorously opposed the above prohibitions against interlocking directors upon the grounds that section 10 of the bill would seriously curtail the availability of competent persons as directors.

The industry representatives also opposed section 30(e) of the bill upon the ground that there was a possibility that such personal information might become public although the trading did not affect the investment company.

Furthermore, the industry—while frankly admitting the potential dangers inherent in those situations—strongly urged that the requirement for "independent directors" would supply the effective deterrent for these abuses. In addition, it was apparent that, if the statute (as requested by the industry) did permit a director to occupy a position of conflicting interest, section 36 of the Act would become operative in the event that the director did wrongfully subordinate the company's interest to his own interest or to the interest of others. In that case, such acts would constitute "gross misconduct or gross abuse of trust."

The adoption of the prophylactic provisions for "independent directors" did not eliminate or abate the fiduciary duties resting on the other directors nor did the requirement for such "independent directors" grant these other directors immunity against the operation of section 36.

Acting upon the industry's assurance that the requirement for "independent directors" would impose an effective duty of vigilance on such directors and further relying upon the inherent interrelationship between the "independent directors" provisions and "the gross abuse of trust" provisions, Congress eliminated from the bill the prohibitions against interlocking directors and the requirement for disclosure of director's trading in securities.

To contend now that the Act does not create a federal duty in respect of the independent directors or does not subject such directors to federal liability or that the subordination by these independent

company is a violation of the Act for which there is a private civil remedy on the part of the aggrieved company—is strongly supported by a study of the evolution of section 17(e) of the bill into sections 36 and 37 of the Act, and of section 17(f) (2) of the bill into section 17(h) and (i) of the Act.

H.R. 8935 (76th Congress, 3d Sess.), introduced March 14, 1940, and the companion bill in the Senate (S. 3580) contained a series of provisions in section 17, entitled "Transactions Of Certain Affiliated Persons And Underwriters." Subsection (e) of section 17 read as follows:

"Any gross misconduct or gross abuse of trust in respect of a registered investment company, on the part of any person registered under section 9 as an affiliated person of or principal underwriter for such company, shall be unlawful."

Section 9 of the bill required the registration of officers, managers, directors, investment advisers and underwriters. The Commission was given the power to deny, suspend or revoke registration.

Subsection (f) of section 17 read, in part, as follows:

"After one year from the effective date of this title, it shall be unlawful

for the charter, certificate of incorporation, articles of association, by-laws, or trust indenture of any registered investment company, for any employment, management, underwriting, or brokerage contract or agreement to which such company is a party, or for any other instrument pursuant to which such a company is organized or administered, to contain any provision which—

"(1) authorizes, or purports to authorize, the violation of any provision of this title or of any rule, regulation, or order hereunder, or

"(2) relieves, or purports to relieve, any affiliated person of or principal underwriter for such company from any duty or liability to such company or the security holders thereof to which such person or underwriter would otherwise be subject."

Section 43 of the bill, entitled "Penalties," provided that any person who willfully violates any provision of the statute could, upon conviction, be punished by a maximum of two years' imprisonment or a maximum fine of $10,000, or both. There was no specific criminal provision concerning larceny and willful conversion.

---

directors of the rights of stockholders to the interest of management does not constitute a gross abuse of trust is to frustrate the plain intent of the Congress.

It is also contended that there is no warrant to conclude that a fiduciary duty has been imposed upon directors or a private cause of action created under the Act because the Act was a "compromise" accepted by the industry and that industry would not voluntarily submit to such duty or to such a cause of action.

The Act was not a negotiated settlement with an industry that was opposed to regulation. On the contrary, the reputation of the industry had been so seriously damaged by the miasma of abuses disclosed by the Commission and the ensuing public criticism that the industry—in order to rehabilitate the investment company as a public investment medium—actively supported the legislation.

The public's lack of confidence in unregulated investment companies was evidenced by the facts that the securities issued by investment companies were selling at substantial discounts below their asset values and that the growth in total assets of these companies was negligible.

To restore the public's confidence in investment companies, the industry was apparently prepared to accept not only the provisions imposing fiduciary duties but also criminal sanctions. The statute was a compromise with an even more severe enactment which had been proposed by the Commission.

In this court's opinion, the judicial implementation of the provisions for truly independent directors and for remedies against gross misconduct and gross abuse of trust are critically necessary to prevent a recurrence of the evils and malpractices that victimized the investing public prior to the passage of the Act.

Subsection (e) of section 17 of the bill was discussed by Mr. David Schenker, counsel to the Investment Company inquiry, at the Senate Subcommittee Hearing of April 9, 1940 (Hearings, Part I, pp. 262–263), as follows:

"Mr. Schenker. Subsection (e) of section 17 attempts to set forth a broad standard of conduct.

"You made a suggestion originally, Senator Taft, to this effect: Why can you not set forth in this bill a fiduciary obligation and make it a crime to violate that fiduciary obligation?

"When we came to draft a provision like that it presented a great many problems, because if you try to impose a trustee obligation on these managers, maybe that obligation is much too strict. A trustee in some instances may be liable for negligence. We felt that that was possibly too onerous an obligation to impose upon people who are managing investment companies. So we took the broader approach and said that if he was guilty of gross misconduct or gross abuse of trust, then he was guilty of a crime. Of course that does not mean that the Securities and Exchange Commission has the jurisdiction to determine whether he has been guilty of gross abuse or gross misconduct or gross abuse of trust. That is a criminal offense, and criminal action would have to be instituted against him.

"Senator Taft: There is a criminal statute which covers that, is there?

"Mr. Schenker: Yes, sir; and penalties are provided for it. The penalties are referred to in section 43 on page 84 of the bill."

Previously, on January 23, 1940, at a conference between representatives of the Commission and the closed-end investment companies, it was stated:

"19. The staff [of the Commission] was trying to establish some standard of personal liability for officers and directors to stockholders. It was suggested that such might be the same as the responsibility of the trustee under the Barkley bill."

[Hearings before the Senate Subcommittee, April 15, 1940, p. 402.]

Mr. Schenker's statement significantly disclosed (1) that the objective was to impose fiduciary obligations upon Management; (2) that the criterion of a trustee-obligation was considered as possibly "too strict" or "too onerous," and therefore "the broader approach" was taken of prescribing the standard as "gross misconduct or gross abuse of trust"; and (3) that a person guilty of "gross misconduct or gross abuse of trust * * * was guilty of a crime."

The objection to section 17(e) of the bill was voiced by representatives of investment companies. The sole ground of their objection was that the provision "subjected persons to *criminal* penalty for violation of an indefinite standard which was impossible of determination." (Emphasis supplied.) This objection was most clearly specified by Mr. Alfred Jaretzki, Jr., in the following terms (Hearings before a Subcommittee of the Committee on Interstate and Foreign Commerce, House of Representatives [76th Cong., 3d Sess.] on H.R. 10065, at p. 124):

"The original bill contained a provision making unlawful gross misconduct and gross abuse of trust on the part of officers and directors of investment companies *and consequently making such conduct subject to the penalties of the act.* The group [closed-end companies] that I represent *objected to this provision on the ground that it subjected persons to criminal penalty for* violation of an indefinite standard which was impossible of determination. In agreeing that this provision be eliminated from the bill the Securities and Exchange Commission suggested as a partial substitute therefor that larceny and embezzle-

ment of investment companies should constitute a Federal crime."

A year later, Mr. Jaretzki made the same point in his article, The Investment Company Act of 1940, 26 Wash.L.Q. 303, 344 (1941):

"This provision [section 36 of the Act] grew out of one in the original bill [section 17(e) of the bill] which made any gross misconduct or gross abuse of trust unlawful. The industry objected to it *on the ground that such an indefinite standard should not be made the basis of a federal offense.*" (Emphasis supplied.)

It was the aspect of criminality that was found objectionable. Greene, Fiduciary Standards Of Conduct Under The Investment Company Act of 1940, 28 Geo. Washington L.Rev. 266, 270–271, notes 12–15; 284, no. 38.

As a result of the above objection and a number of others directed against other provisions of the bill, representatives of the Commission (principally Mr. David Schenker) and representatives of the industry (notably Mr. Jaretzki, for the closed-end companies, and Mr. Warren Motley, for the open-end companies) cooperated in developing a memorandum of agreement, dated May 13, 1940, entitled "Framework of Proposed Investment Company Bill (Title I)," and representing "principles for regulation" which "received unanimous endorsement of the industry." House Subcommittee Hearings (June 13 and 14, 1940), p. 63 (Judge Healy); pp. 71, 72 (Arthur H. Bunker); pp. 96–100 (the text of the memorandum).

Paragraph 16 of the memorandum of May 13, 1940 provided, in part, as follows (House Subcommittee Hearings, June 14, 1940, p. 98):

"The Commission is to have the right to bring proceedings in courts of appropriate jurisdiction to enjoin any proposed gross misconduct or gross abuse of trust, or for an adjudication of gross misconduct or gross abuse of trust for the purpose of disqualifying a person under paragraph 8 [dealing with prohibition of certain persons acting as officers or directors]. Larceny and embezzlement are to be made specific Federal offenses."

In accordance with the compromise agreement, the bill was amended by H.R. 10065 and S. 4108 so as to eliminate section 17(e) of the bill and to set forth two new sections: section 36, entitled "Injunctions Against Gross Abuse[s]," and section 37, entitled "Larceny And Embezzlement," both of which new sections are now in the Act.

As its title indicates and in accordance with the terms of the compromise agreement pursuant to which it was drafted, section 36 permits proceedings by the Commission to obtain injunctions against any proposed gross misconduct or gross abuse of trust or against the continuation in office of any director, officer, investment adviser or principal underwriter found guilty of gross misconduct or gross abuse of trust.[2]

The worst forms of such misconduct or abuse—larceny, embezzlement and willful conversion—were made the subject of a special penal provision, embodied in section 37. Referring to section 37 as making larceny and embezzlement from registered investment companies "a Federal crime," House Rep. No. 2639 (76th Cong., 3d Sess. June 18, 1940) p. 26, pointedly said:

"This provision is in line with similar provisions relating to national banks, interstate carriers, and other institutions subject to comprehensive Federal supervision."

A practical reason advanced for making such acts a separate and independent crime was that, by so doing, a federal prosecutor would avoid the difficulties

---

2. Motley, Federal Regulation of Investment Companies Since 1940, 63 Harvard L.Rev. 1134, 1153 (1950):
"Section 36 authorizes the SEC to seek to enjoin officers, directors, and other affiliates of a registered investment company for gross misconduct or gross abuse of trust."

sometimes encountered in employing the mail fraud statute as the basis for prosecution. Hearings before Senate Subcommittee, May 31, 1940, p. 1120 [Mr. David Schenker].

Mr. Martin Conboy, former United States Attorney for the Southern District of New York, was opposed to section 37, arguing that "there is no need for making them [larceny and embezzlement from an investment company] Federal offenses. * * * the Federal Government should not seek to invade the jurisdiction of the States' prosecuting authorities in cases which should obviously be prosecuted by the latter." Hearings before House Subcommittee, June 13 and 14, 1940, p. 123.

It was Mr. Jaretzki, Jr., who answered Mr. Conboy as follows:

"[I]t seemed entirely appropriate to the industry that, *as the Federal Government was to take jurisdiction over the industry,* it should have jurisdiction to prosecute such offenses. The investment companies as a body have taken the position that any provision of this kind that might tend to keep dishonest persons out of the business was salutary and in the best interests of the industry and they would certainly not wish to question a provision of this sort." (Emphasis supplied.) Hearings before House Subcommittee, June 13 and 14, 1940, p. 124.

Henry J. Simonson, Jr., president of National Securities and Research Corporation, testified that section 37 was desirable because "unless there were severe penalties in there, the enforcement might be somewhat retarded," notwithstanding that most States "have criminal penalties to take care of these things." Hearings before House Subcommittee, June 13 and 14, 1940, p. 85.

The circumstance that gross misconduct and gross abuse of trust was made the subject of a special injunction provision (section 36) or that willful conversion was made the subject of a special criminal provision simply highlights the enforcement devices or procedural sanctions employed by the Act against the proscribed conduct. The subsisting substantive duty is to refrain from the commission of the proscribed acts; and the doing of such unlawful acts constitutes a statutory violation for which the victim has an implied private civil remedy.

Section 17(f) (2) of the bill, quoted above made it "unlawful" for the charter, certificate of incorporation, etc. of a registered investment company to contain any provision which relieves "any affiliated person of or principal underwriter for such company from any duty or liability to such company or the security holders thereof to which such person or underwriter would otherwise be subject." As noted, subsection (f) (2) was a companion provision to subsection (e) of section 17, which made it "unlawful" for "an affiliated person of or principal underwriter for" a registered investment company to commit "any gross misconduct or gross abuse of trust."

When section 17, subsection (e) of the bill was transmuted into sections 36 and 37 of the statute, section 17, subsection (f) (2) underwent the following significant changes:

1. The enumeration of the instruments in which exculpatory clauses might be incorporated eliminated "any employment, management, underwriting, or brokerage contract or agreement to which such company is a party" but retained [in section 17(h) of the Act] the other references to the instruments embraced within the provision, including the comprehensive phrase "any other instrument pursuant to which such a company is organized or administered"; and retained in section 17(i) of the Act contracts with investment advisers and principal underwriters.

2. The words "any affiliated person of or principal underwriter for" were spelled out into "any director or officer" [section 17(h) of the Act] and "investment adviser" and "principal underwriter" [section 17(i) of the Act].

3. The words "any duty or liability to such company or the security holders thereof" were most significantly expanded into and specified as: "any liability to the company or to its security holders to which he [director or officer] would otherwise be subject by reason of willful misfeasance, bad faith, gross negligence or reckless disregard of the duties involved in the conduct of his office" [section 17(h) of the Act]; and "any liability to such company or its security holders to which he [investment adviser or principal underwriter] would otherwise be subject by reason of willful misfeasance, bad faith, or gross negligence, in the performance of his duties, or by reason of his reckless disregard of his obligations and duties under such contract or agreement."

H.Rep. No. 2639 (76th Cong., 3d Sess., June 18, 1940) [To accompany H.R. 10065] p. 18 summarized section 17(h) and (i) as providing that directors, officers, principal underwriters and investment advisers "are not to be permitted to exculpate themselves from liability for willful misfeasance, bad faith, gross negligence, or reckless disregard of their duties." The same statement appears in Senate Report No. 1775 (76th Cong., 3d Sess., June 6, 1940) [To accompany S. 4108] p. 15. The subject of exculpatory clauses was covered in paragraph 15 of the compromise "Framework of Proposed Investment Company Bill (Title I)" of May 13, 1940. Hearings before the House Subcommittee, June 14, 1940, p. 98. As enacted, section 17(h) and (i) follows closely a draft prepared by a spokesman for the investment companies.

The full import and intended reach of the provisions embodied in section 17(h) and (i) and sections 36 and 37 cannot be appreciated without recalling that witness after witness (representing the industry and the SEC) before the Congressional Committee testified specifically to:

(A) the disregard by "sponsors, managers and insiders" of "their basic fiduciary obligation to their investors" in order "to advance their personal interest"; the "gross abuse by unscrupulous persons" in "control of investment companies" who "have not hesitated to engage in self-dealing." Hearings before the Senate Subcommittee, Part I, pp. 37, 38, 46 [Judge Robert E. Healy]; Senate Report No. 1775 [To accompany S. 4108], June 6, 1940, pp. 6–7, 12; House Report No. 2639 [To accompany H.R. 10065], June 18, 1940, pp. 7–10; Hearings before the House Subcommittee, pp. 57, 58, 59 [Judge Healy]; p. 72 [Arthur H. Bunker, executive vice-president of Lehman Corporation]; pp. 74, 76, 78, 80; p. 101 [The "Findings and Declaration of Policy" set forth in Section 1 of the Act were "agreed to as proper findings by the industry itself," according to Mr. Schenker, counsel to the Commission].[3]

(B) the necessity for Federal supervision and regulation of investment companies to protect the legitimate companies and to provide investors "with a regulated institution for the investment of their savings" "comparable to a savings bank" and an insurance company; and, specifically, to protect investors "against unscrupulous management" and "breaches of trust." Hearings before the Senate Subcommittee, Part 1, pp. 38–39, 46 ["The bill undertakes to impose specific conditions" in order to "insure the observance" of "the fiduciary obligation of the management to stockholders"] Part 2, pp. 440, 775; Senate Report No. 1775 [To accompany S. 4108], June 6, 1940, pp. 11–12 ["However, the record does indicate that some of the grossest abuses were perpetrated in most recent

3. Hornstein, Book Review [Investment Trusts And Investment Companies: Report of the Securities and Exchange Commission], 40 Col.L.Rev. 764, 767 (1940):
"A perusal of either the original testimony or the Report makes inevitable the conclusion that many fiduciaries act primarily for their own profit and employ almost precisely the same fraudulent methods."

years, * * *. [T]he perpetrations of these misfeasances and the recurrence of these abuses cannot be completely abated nor the deficiencies eliminated without the enactment of adequate Federal legislation regulating these institutions. * * The representatives of the industry recognized that the protection of investors against unscrupulous management and the necessity for the prevention of the recurrence of the abuses * * * made indispensable the immediate enactment of adequate legislation regulating investment companies. This is also the opinion of the committee, and the Securities and Exchange Commission concurs. Representatives of the industry have stated for the committee's record that they definitely feel that this bill (S. 4108) will materially abate, if not virtually eliminate, the malpractices and deficiencies in these organizations. They have urged that this legislation will serve the most salutary purpose of protecting small investors from breaches of trust; will afford investors a regulated and supervised institution in which to invest their savings; * * *; and will supply an intelligent and articulate group of stockholders in industrial and other public corporations. The industry asserted, and the Commission and the committee believe, that this legislation will tend to prevent those abuses which have been a stigma upon and impaired the usefulness of the investment trust industry as a whole."]; House Report No. 2639 [To accompany H.R. 10065], June 18, 1940, pp. 9–10; Hearings before the House Subcommittee, pp. 57–59, 63, 65, 72, 76, 78, 79, 86.

The clear congressional purpose was to protect investors and investment companies by imposing the duty on directors, officers, investment advisers, and principal underwriters to refrain from committing acts constituting gross misconduct or gross abuse of trust. It follows that a violation of that statutory duty renders the violator civilly liable to the victim, and that that liability may be enforced in a private action brought in the Federal court.

The special Commission action authorized by section 36 does not preempt the field of remedial proceedings. A private action by those aggrieved by the misconduct would furnish both compensatory relief and, pragmatically, an additional enforcement sanction. Taussig v. Wellington Fund, supra, 187 F.Supp. at page 219, squarely held that section 35 (d)—which is a cognate SEC-injunction provision—did not preclude a private action by the aggrieved company. See Schectman v. Wolfson, 2 Cir., 1957, 244 F.2d 537, 539 [stockholder's derivative action to enforce section 8 of the Clayton Act, 15 U.S.C.A. § 19]; Dederick v. North American Co., D.C.S.D.N.Y.1943, 48 F.Supp. 410, 412 [stockholder's derivative action for money had and received and for an injunction commenced during the pendency of Commission proceedings under the Public Utility Holding Company Act of 1935, 15 U.S.C.A. § 79 et seq.]

The absence of criminal sanctions from section 36 is not controlling. As was said in Texas & New Orleans R. Co. v. Brotherhood of Railway and Steamship Clerks, 1930, 281 U.S. 548, 569, 50 S.Ct. 427, 433, 74 L.Ed. 1034:

> "The absence of penalty is not controlling. The creation of a legal right by language suitable to that end does not require for its effectiveness the imposition of statutory penalties. Many rights are enforced for which no statutory penalties are provided."

Accord: Restatement, Torts (1934), section 287.

In light of the foregoing discussion, the full significance of section 44 of the Act is revealed when it declares that the "district courts of the United States * * * shall have jurisdiction * * * concurrently with State * * * courts, of all suits in equity and actions at law brought to enforce any liability or duty created by, or to enjoin any violation of,

this title or the rules, regulations, or orders thereunder."

The concurrent jurisdiction of the federal courts of all suits in equity and actions at law brought to enforce any liability or duty created by the Act is a clear recognition of private remedies both in equity and at law. Since the Commission can bring only equity suits and only in the federal courts [sections 35(d), 36 and 42(e)], the other elements in section 44 must refer to appropriate private actions and suits, in the proper federal or state court to enforce any liability created by the Act.

■ In so construing the Act—to imply a right of private federal action by one aggrieved by the commission of acts proscribed inferentially by sections 17 (h) and (i) and 36—this court is adhering to the "doctrine that courts will construe the details of an act in conformity with its dominating general purpose, will read text in the light of context and will interpret the text so far as the meaning of the words fairly permits so as to carry out in particular cases the generally expressed legislative policy * * *." Securities and Exch. Comm. v. C. M. Joiner Leasing Corp., 1943, 320 U.S. 344, 350–351, 64 S.Ct. 120, 123, 88 L.Ed. 88.

The words spoken by the Court of Appeals in Goldstein v. Groesbeck, 2 Cir., 1944, 142 F.2d 422, 427, 154 A.L.R. 1285, certiorari denied, 1944, 323 U.S. 737, 65 S.Ct. 36, 89 L.Ed. 590 [implying a private action by virtue of section 26(b) of the Public Utility Holding Company Act of 1935 voiding any contract made in violation of that statute] must be kept in mind:

"[A] denial of a private right of action to those for whose ultimate protection the legislation is intended leaves legislation highly publicized as in the public interest in fact sadly wanting, and even delusive, to that end."

The indifference to federal civil liability for "gross misconduct or gross abuse of trust" attributed by defendants to Congress cannot be reconciled with the emphatically expressed purpose of Congress to eliminate those very evils and to protect investors against those very abuses. When, by the Investment Company Act, the federal government became the national watchdog of registered investment companies for the protection of investors, it assumed the power and jurisdiction to make that regulation and supervision effective. That power and jurisdiction embrace the traditional right of a person directly aggrieved by a statutory violation to sue the violator. That right should also "be read against the background of tort liability that makes a man responsible for the natural consequences of his actions." See Monroe v. Pape, 1961, 365 U.S. 167, 81 S.Ct. 473, 484, 5 L.Ed.2d 492.

The possibility of multitudinous strike suits under the Act and the consequent expansion of federal jurisdiction is a spectre conjured up by defendants. The results of this court's holding will not be as horrendous as defendants would have it appear. If the fear of personal liability to the company or stockholders for gross misconduct or gross abuse of trust induces potential wrongdoers to walk in the paths of rectitude, the very availability of a private remedy will have served a desirable enforcement function.

Where there is diversity of citizenship, such private actions could be brought in this court on that independent jurisdictional basis. Since investment companies are incorporated in various states and their stockholders and officials are dispersed geographically, the likelihood is that in many, if not most, cases there would be indisputable federal diversity jurisdiction despite the objections now voiced by the defendants. Desiderata of readily available history, manifest legislative purpose, articulated public policy and plain congressional language outweigh the fortuity of diverse citizenship of litigants as a pivot of federal jurisdiction. The validity of such federal statutory jurisdiction—independent of the happenstance of diversity of citi-

zenship—is strengthened by the desirable objective of fashioning a body of federal substantive law, nationwide in scope and uniform in content. Cf. Textile Workers etc. v. Lincoln Mills, 1957, 353 U.S. 448, 451, 456–457, 77 S.Ct. 912, 1 L.Ed. 2d 972.

Defendants rely heavily upon Brouk et al. v. Managed Funds, Incorporated, et al., 8 Cir., 1961, 286 F.2d 901, 918 (petition for rehearing denied March 6, 1961; motion by SEC for leave to participate amicus curiae denied March 6, 1961), where there was a reversal of an order denying motions to dismiss the complaints in a stockholder's derivative action and in an action by the corporation itself, both brought under the 1940 Act. As will be shown, defendants' reliance on that decision is misplaced.

The Brouk case held that the 1940 Act did not impose "strict liability as insurers" or any per se or vicarious liability on the "outside" directors of a registered investment company; and, therefore, that any claim based upon such liability is exclusively a State claim not cognizable in the federal courts. In the case at bar, the claim as pleaded is not based on per se or vicarious liability but on collusive or willful violations by the defendants themselves of specific duties imposed upon them by the Act.

Secondly, the Record on Appeal (Civil No. 16,566) and the Court's opinion in the Brouk case, clearly disclose that there were thirty defendants, of whom twelve were expressly described as "outside directors"; and the only defendants who prosecuted the appeal were seven of the "outside directors," who had moved to dismiss the complaints on jurisdictional grounds. Thus, the question actually decided by the Court of Appeals in the Brouk case was fundamentally different from the issues posed herein.

The actual holding of the Court of Appeals may best be gathered from the following statement in its opinion, 286 F. 2d at page 918:

. "The complaints here substantially seek to hold these former directors to *strict liability as insurers*. The Act they rely on not only contains no such provision but plainly negates any intent to create such an innovation." (Emphasis supplied.)

In the same vein, the Court held, 286 F.2d at page 912, that:

"[T]o render them [the appellant-directors] liable by implication on account of violations of the Acts *by others* would be a drastic innovation." (Emphasis and interpolation supplied.)

Similarly, the Court, 286 F.2d at page 912, deemed it "improbable that there would have been such unanimity for the passage of the Act if it had been thought to impose any such *per se liability* on directors as is claimed * * * here." (Emphasis supplied.)

This court is in respectful disagreement with the views expressed in the Brouk case to the extent that they restrictively interpret the 1940 Act. The opinion herein articulates the basis for such divergence.

The motions must be denied *"unless it appears to a certainty"* that plaintiffs are *"entitled to no relief under any state of facts which could be proved in support of the claim."* 2 Moore's Fed. Pr. (2d Ed. 1948), section 12.08, p. 2245 (Emphasis in original.); Joseph v. Farnsworth Radio & Television Corp., D.C.S.D.N.Y.1951, 99 F.Supp. 701, 704, affirmed 2 Cir., 1952, 198 F.2d 883; Cogan v. Johnston, D.C.S.D.N.Y.1958, 162 F.Supp. 907, 909.

It is reversible error to dismiss a complaint where "under any reasonable reading, the complaint states a claim upon which relief can be granted," although the complaint may contain "ambiguities." See Arfons v. E. I. Dupont De Nemours & Company, Incorporated, 2 Cir., 1958, 261 F.2d 434, 435.

The complaint satisfies the criteria of sufficiency as a pleading. The motions are hereby denied. So ordered.

Supplemental Memorandum-Decision.

Defendants' application pursuant to 28 U.S.C.A. § 1292(b) to resettle and amend this Court's order of March 9, 1961, is granted upon the express conditions hereinafter set forth:

In said order, as hereby resettled, the Court now states that said order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation.

No serious objection to the resettlement and amendment of this Court's order has been interposed by the plaintiffs. The Securities and Exchange Commission, as amicus curiae, by letter dated March 21, 1961, addressed to defense counsel, copy of which has been supplied to this Court, states inter alia, "The Commission will, therefore, neither support nor oppose your present motion for an immediate appeal.

"However, as the Commission's chief legal officer charged with the responsibility of following developments in the host of private lawsuits now pending in various State and Federal courts which involve issues substantially similar to those which concern the Commission in Brown v. Bullock, I would personally welcome prompt review by the Court of Appeals of the important question of law involved here. I, of course, could not, and do not, concur in the arguments urged in your memorandum which asserts that 'The Court erroneously decided a controlling legal question as to which there is substantial ground for difference of opinion.' In my view Judge Herlands correctly decided the issues before him and supported his decision with a thoroughly sound and very able opinion."

There is a sharp difference of opinion between the parties as to the conditions upon which this Court should grant the instant application. This issue of "conditions" has arisen because defendants asked "for a stay of all proceedings in this action on behalf of plaintiffs pending the determination of any appeal from such order and for such other and further relief as to the Court may seem just and proper."

There has been extended oral argument. An official transcript (of forty-seven pages) of said argument is available. The granting of a stay on conditions, under circumstances analogous to those involved in the present case, is illustrated in Mottolese v. Kaufman, 2 Cir., 1949, 176 F.2d 301, and the decisions following it. As to permitting Federal deposition-discovery procedures notwithstanding the pendency of a State action between the same parties covering the same transactions, see Sagorsky v. Malyon, D.C.S.D.N.Y.1952, 12 F.R.D. 486; Montro Corp. v. Prindle, D.C.S.D.N.Y. 1952, 105 F.Supp. 460; Levy v. Alexander, D.C.E.D.N.Y.1959, 170 F.Supp. 439; Neuwirth v. Namm-Loeser's, Inc., D.C. E.D.N.Y.1958, 161 F.Supp. 828.

The following conditions are hereby made a part of the order as resettled and amended:

1. The plaintiffs are forthwith stayed pending the determination of the appeal to be taken herein from conducting any proceedings in the litigation now pending in this court on condition that the defendants forthwith stipulate that they consent to the plaintiffs' motion now pending in the New York State Supreme Court, New York County, in the companion case brought by the plaintiffs herein against the defendants herein by which motion plaintiffs seek to have the State Court's action stricken from the State Court trial calendar pending the determination of the appeal to be prosecuted herein.

2. In the event that the defendants do not so stipulate to the granting of the said State Court motion (the defendants thereby expressing their intention not to invoke the stay of the plaintiffs in this court), the plaintiffs are permitted to conduct deposition-discovery proceedings in this court, notwithstanding the pendency of any appeal herein.

The Court is granting defendants' application under 28 U.S.C.A. § 1292(b) on conditions designed to render substantial justice to the parties. Substantial justice can best be achieved, under the circumstances here prevailing, by maintaining the status quo pending the determination of such appeal. However, if defendants do not consent to a cease-fire in the State action, the plaintiffs should not be stayed in this Federal action.

It has been represented to the Court by both sides that, unless the said State Court action is stricken from the said State Court trial calendar pending the appeal herein, the State action will be tried by the end of April or some time in May, 1961. Both sides agree that a State Court decree between the same parties and involving the same transactions would operate as res judicata and estoppel with respect to the action pending in this court and would render moot an appeal herein to the Court of Appeals for the Second Circuit. Thus, a State Court decree would have important Federal impact in that it would be dispositive of the Federal litigation pending in this court and in the Circuit Court of Appeals.

The State Court decree would be rendered in a case in which (by virtue of the operation of New York County Supreme Court, Trial Term Rules, Rule XI, subdivision 7) the plaintiffs would not have had any pretrial examinations or discovery and inspection whatsoever. The local State Court rule embodies a public policy fundamentally different from the public policy prevailing in this court as to pretrial proceedings in stockholders' litigation. See 2 Hornstein Corporation Law and Practice, 1959, Section 728, pages 240–241. However, the effect and operation of such State Court decree would undercut one of the very reasons urged by defendants for permitting the appeal herein, namely that there is a mass of Federal litigation in this and other districts under the Investment Company Act of 1940 and that it is of great practical importance for litigants and the administration of justice that

the Court of Appeals for this circuit render a decision determining the issues posed upon the appeal herein. The defendants, in applying under 28 U.S.C.A. § 1292(b), have emphasized the pendency of such other Federal cases and the importance of obtaining a definitive decision by the Court of Appeals for this circuit in this case. Thus, in defendants' memorandum in support of resettlement and amendment of the order filed March 20, 1961, the following statement is made at pages 2–3:

"We have here, in addition, the further consideration that this Court's opinion is presumably dispositive of the issue of federal jurisdiction in approximately twelve other cases now pending in this court involving eight other investment companies. In each of these approximately twelve cases the complaint is essentially the same as the complaint or amended complaint in the case at bar. So that, if this Court erred in the disposition of defendants' motions, an interlocutory appeal would spare this Court and more than a score of litigants many, many months of protracted litigation."

At page 7 of said memorandum of defendants the following statement was made:

"Further, unless an interlocutory appeal is permitted to test the sufficiency of the amended complaint, the substantial questions of statutory interpretation decided here may never be presented for appellate determination in this or in any of the approximately twelve other similar cases now pending in this court."

And at page 8 of the said defendants' memorandum the following statements are made:

"If, as we believe, the Court erroneously decided a controlling legal question as to which there is substantial ground for difference of opinion, an interlocutory appeal would probably clear approximately twelve cases from this court's crowded docket. While it is difficult to estimate at this stage of the case the probable length of any trial, we do not believe that this case could be tried in less than two

weeks. This estimate, we believe, is probably low. If that estimate is multiplied by eight (the approximate number of investment companies in whose behalf such suits are pending), it becomes apparent that an interlocutory appeal in this case should be allowed in the interest of sound judicial administration."

While the enabling of the plaintiffs to prepare for the State trial is one of the practical effects of permitting plaintiffs to avail themselves of the Federal deposition-discovery procedures in the pending Federal case (which permission is granted only if defendants do not stipulate to consent to the striking of the State action from the State trial calendar pending the determination of the defendants' Federal appeal herein), the objective of this Court in granting such conditional permission to the plaintiff is to avoid the frustration of the Federal appeal proceedings by force of a State decree that would operate as res judicata or estoppel. If the Federal appeal were to be rendered moot, then the very purpose of allowing this appeal on defendants' application would be defeated by the same defendants who are applying for permission to appeal. The defendants thus blow hot and cold. They ask this Court to grant them permission to prosecute this Federal appeal while at the same time they plan to engage in a State proceeding that would render that appeal moot. While defendants tell this Court that (in the words of the statute) "an immediate appeal from the order may materially advance the ultimate termination of the litigation" (defendants' memorandum in support of resettlement and amendment of order, pages 2–3, 7, 8), they now seek to utilize the requested stay of the plaintiffs pending such appeal as a maneuver in a plan to frustrate their avowed objective. If the defendants want to avoid a question as to their good faith in asking permission to prosecute an appeal herein, it would seem that they should stipulate to maintain the status quo.

So ordered.